## BONEY *v.* SMALLWOOD.

No. 15822. MAY 23, 1947. REHEARING DENIED JUNE 13, 1947.

*Stephens & Warnock* and *W. A. Dampier,* for plaintiff in error.
*G. H. Williams* and *C. C. Crockett,* contra.

WYATT, Justice. ■ A bill of exceptions tendered on January 16, 1947, excepting to a judgment dated December 19, 1946, overruling a motion for new trial, is not subject to dismissal because not tendered within twenty days from the date of the rendition of the judgment, as required by the new rules of appellate procedure, which did not become effective until January 1, 1947 (Ga. L. 1946, 726 et seq.).

■ The single question presented relates to the sufficiency of the evidence to support the verdict.

On the trial of this case the original beneficiary sought to show a vested interest in the policy by offering evidence as to an oral agreement between the original beneficiary and the insured, at the time the policy was secured, whereby the beneficiary agreed to pay the premiums on the policy and the insured agreed not to change the beneficiary. This evidence, together with evidence to the effect that the original beneficiary and the insured's family subsequently paid some of the premiums, was allowed, over objection, to go to the jury. However, the trial court expressly limited the jury to a consideration of this evidence on the issues of fraud and insanity. Thus, the trial court in effect eliminated any issue as to a vested interest in the original beneficiary in the policy. Whether this ruling was correct, it is unnecessary for us to decide (but see, in this connection, *Washburn* v. *Washburn,* 188 *Ga.* 468, 4 S. E. 2d, 35), for in passing on the general grounds of the motion we shall deal with the case as presented and tried in the lower court.

On the only two issues upon which evidence was offered, the evidence was insufficient to support the verdict. The following is a resume of the evidence most favorable to Smallwood, the original beneficiary:

Willie Smallwood, a brother of the original beneficiary, testified as follows: "My father worked at Robins Field and boarded at my house from Sunday night to Saturday morning each week. He left my house Saturday morning before he died on Sunday morning. I had an opportunity to observe him. His mind sure wasn't right. He could be at my house sitting on my porch and I would go out to talk with him, and he would walk off and leave me and stay by himself. He wasn't the same person he had been, and just wasn't at himself. He wouldn't have anything to do with none of us. If you tried to talk with him, he would get up and leave you and was altogether a different person. He seemed to be worried. Mrs. Boney was not his daughter that I know of; and she wasn't any kin to him that I know of. She lived near his home, and he visited her often. He did not have any reason to visit her in matters of business or friendship that I know of. I don't know of the circumstances of his death of my own knowledge. . .

I don't know why he was going out there. Mrs. Boney is comparatively young, and my father was 58 years old when he died. From Christmas up until the time he died, Mama lived on the edge of Dublin; and the year before that they lived four or five miles from Mrs. Boney. I did not make any protest to my father about seeing him with her. I just blowed my horn and he come out to the car and I talked to him, and we were just as pleasant and jolly as could be, and I talked with him about thirty minutes. He was standing on the ground with his head in the car. . . As to how I arrived at the conclusion that he wasn't at himself, he wouldn't have anything to do with none of us; he wouldn't talk to anybody; he just wasn't the person he had been. That is all that I know of he did. He would go out and sit down by himself. That is the only reason I can give why I say he wasn't at himself. . . He would go off and brood. He wasn't to say dangerous. He wouldn't take a shotgun or a knife up and kill you; he wasn't that far gone with it."

Mrs. Thomas B. Smallwood, wife of the insured, testified: "My husband died from pistol wounds. I never saw him with Mrs. Boney but one time; they came from church together. He visited her house a right smart. If she was any kin to him, I don't know it. . . Mrs. Boney wasn't his daughter. He had left home and had been working in Macon a short while before he died. He came down here just about every week, but a whole lot of times he wouldn't come by our home at all. Before he died, his mind had been bad for a year or two, at times. He seemed to be all right there at the house when he left. When he went to Mrs. Boney's home, I didn't think he should have done it. He was just off at times. He wouldn't have nothing much to say. He acted very well that Sunday morning before he died, but that Saturday he didn't. He had been acting kinder off for a year or two at times. The insurance policy was not mentioned between us all for a year or so before his death. I couldn't tell you of any unusual influence Mrs. Boney had over him. He spent the Saturday night before he died at home with me. We were then living here in town at the ice plant. The Boneys lived about five miles from us. He left home early that morning and said he was going to church, and I didn't hear of his death until about 12 o'clock. I don't know of my own knowledge how he met his death. I just

know he was shot up at the Boneys'. . . Sometimes he would go to Macon by himself and sometimes he would go along with the boys. Sometimes the boys would go with him to drive the car because he was nervous. Lots of times somebody went with him, and lots of times I have seen him drive by himself. He continued to drive occasionally up until the time of his death. He never did grumble and growl much around the house. Nothing was unusual in May, as far as he was concerned."

Velmon T. Smallwood testified in his own behalf as follows: "He died at the Boneys' house. I don't know of any circumstances of him going with Mrs. Boney. I saw them at one time in the field together, and I saw them at the house several times. I don't know of any business relations that they had. She was not any kin to him. Me nor any other members of the family objected to their going together, and there was no protest about their going together. My father met his death by a pistol. I went to the house where he was about 10 o'clock, as soon as I got the word. He was inside the house. I wouldn't say how he met his death. I saw my father quite a bit for a month or so before he died. He wasn't right. He wouldn't talk to me. I have drove him to Macon and he wouldn't speak to me. . . My father sent the money for the premiums to the home office in Galveston, Texas, or either paid Mr. Brown. My father would always send it in himself. I don't know when he paid the last payment before his death. He knew how and where to send it, and how to write the letter. He knew what he was doing in that connection. I didn't know that he went to Macon and borrowed money from the insurance company to pay the premiums, but I found that out later. I reckon he knew what he was doing then. I guess he knew what he was doing right on up until the time of his death."

Robert Howard testified: "I know Mrs. Leila Boney. At the time this took place, I lived about a half mile from her. I knew Mr. Smallwood during his lifetime. I don't know of any kinship between Mr. Smallwood and Mrs. Boney. Mr. Smallwood was about 60 years of age, and Mrs. Boney is comparatively young. I have seen them together a lot of times. I have seen them riding around on the highway, and I have seen Mr. Smallwood down at her house, and I have seen them in the field together, and places like that. Mrs. Boney's husband was at home a lot of times I saw

Mr. Smallwood there. . . Mr. Smallwood was often in her company. He was married and his wife was living. . . I didn't see Mr. Smallwood in Mrs. Boney's house. I saw him in the yard, because I never had been in the house. Buck Boney, her husband, was with them. When I saw them on the highway, Buck would not be with them. Sometimes they would be going toward Dublin. I don't remember seeing Buck with them in an automobile. I remember Mr. Smallwood going there one day and Buck took the two children and went to the field and left them at the house. I was plowing in front of the house. . . The old man was apparently able to work and did work and make his money. I saw him chop cotton with Mrs. Boney one evening. I heard about him working in Macon."

Mrs. T. A. Howard testified: "I never knew anything about Mr. Smallwood keeping company with Mrs. Boney. I saw him over there a good many times each week for six months. I have seen him there when I knew Mr. Boney, her husband, wasn't there. I have seen him there when Mr. Boney was out in the field plowing many times. I have seen Mr. Boney leave them there together. I saw them at church together, and saw them milking the cow near the pond where Mrs. Boney lived, and saw them go to ride several times."

The evidence further disclosed that the insured went to Macon, Georgia, and made application for a change of beneficiary; that in making the written application he designated Mrs. Leila L. Boney as being his daughter. There was no evidence showing that any one accompanied him on this trip to Macon. The evidence is silent as to how the insured met his death, except that it is shown that he died from a gunshot wound in the home of Mrs. Boney.

In this case the only proof offered on the issue of insanity is evidence to the effect that the insured at times refused to talk to members of his family and appeared to be worried; that he secured a change of beneficiary in a life-insurance policy, and represented Mrs. Leila L. Boney to be his daughter, when in fact she was of no kin; that two days after the transfer was effected, he met his death, which was possibly suicidal. This evidence is insufficient to authorize a finding of insanity at the time the transfer was effectuated. Suicide will raise no presumption of insanity, and standing alone will not authorize a finding of insanity. Taken as

416

a whole, the proved facts and circumstances show no insanity in this case. "Proof of weakness of mind, not amounting to imbecility, is not sufficient to warrant a jury in setting aside a contract, there being no proof of fraud or undue influence." *Hartley* v. *Marietta Nursery Co.,* 138 *Ga.* 736 (76 S. E. 39). While "slight circumstances may be sufficient" to show fraud (Code, § 37-706), "fraud may not be presumed." And "circumstances creating a mere suspicion are not sufficient." *Watson* v. *Brown,* 186 *Ga.* 728 (198 S. E. 732). The nearest approach to showing of fraud and undue influence in this case is evidence to the effect that the deceased and Mrs. Boney were seen together quite frequently; that the deceased was 58 years of age and Mrs. Boney was comparatively young. If these circumstances are sufficient to show anything at all, they certainly point to nothing more than a suspicion. They are entirely compatible with a perfectly bona fide relationship. Clearly they are insufficient to show fraud or undue influence.

For the reasons stated, the evidence did not support the verdict, and the trial court erred in overruling the motion for new trial.

*Judgment reversed. All the Justices concur, except Jenkins, C. J., who dissents.*