**Elise Gelzer WHEELESS, Jane Gelzer Menendez, and John Granklin Gelzer, Jr., Plaintiffs,**

v.

**Carolyn D. GELZER, Defendant.**

No. 1:89–cv–2177–RHH.

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 16, 1991.

James Joseph Brissette, Hurt Richardson Garner Todd & Cadenhead, Atlanta, Ga., for plaintiffs.

Jerry Byron Blackstock, Joseph Joel Mercer, Jr., David Graham Ross, Powell Goldstein Frazer & Murphy, Atlanta, Ga., for defendant.

## ORDER

ROBERT H. HALL, Jr., District Judge.

This is an action seeking to set aside two transfers of ownership of certain stocks and securities as based upon fraud and undue influence. Plaintiff Elise Gelzer Wheeless is a citizen of the State of Maryland, Plaintiff Jane Gelzer Menendez is a citizen of the State of Alabama, Plaintiff John Franklin Gelzer, Jr. is a citizen of the State of Georgia, and Defendant Carolyn D. Gelzer is a citizen of the State of California. Thus, diversity jurisdiction is vested with this Court pursuant to 28 U.S.C. § 1332.

This case having come before this Court for trial without jury, the Court, pursuant to Rule 52 of the Federal Rules of Civil Procedure, issues the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1.

Plaintiffs Elise Gelzer Wheeless ("Elise"), Jane Gelzer Menendez ("Jane") and John Franklin Gelzer, Jr. ("Franklin") (collectively, "Plaintiffs") are the three natural children of John Franklin Gelzer ("Mr. Gelzer") and his first wife Dorothy, who died in 1962.

2.

At the time of their mother's death in 1962, Plaintiffs Elise, Franklin and Jane were ages 24, 20 and 6, respectively.

3.

Defendant Carolyn Gelzer ("Defendant") is Mr. Gelzer's second wife.

4.

Prior to her marriage to Mr. Gelzer, Defendant was married to Mr. John Eberhart, who died in 1968. They had one child, a daughter.

5.

Prior to Mr. Gelzer's and Defendant's marriage, Defendant had for a number of years lived across the street from the Gelzer family.

6.

Mr. Gelzer and Defendant were married on November 23, 1973. At that time, Mr. Gelzer was 66 years old; Defendant was 48 years old.

7.

At the time of Mr. Gelzer's and Defendant's marriage, Plaintiff Jane was a 17-year-old senior at the Lovett School in Atlanta, and was living at home. Plaintiffs Elise and Franklin were married and living out of state, Elise in Maryland, and Franklin in California.

8.

Mr. Gelzer was engaged during his lifetime in the insurance business, and was employed since sometime in the 1940's with Crawford & Company, an insurance adjusting firm.

9.

During his employment with Crawford & Company, Mr. Gelzer acquired a substantial number of shares of Crawford & Company stock (the "Crawford & Co. stock").

10.

Mr. Gelzer retired from Crawford & Company in 1972, the year preceeding his marriage to Defendant.

11.

In 1974, approximately six months after his marriage to Defendant, Mr. Gelzer executed the will that was in effect at the time of his death. The 1974 will was prepared by Mr. Edward P. Ellis, an Atlanta attorney employed by Mr. Gelzer. The 1974 will provided, *inter alia*, that upon Mr. Gelzer's death: (1) the marital home would be distributed to Defendant; (2) property remaining from that which Mr. Gelzer had inherited from his first wife would be distributed

among Plaintiffs; (3) Mr. Gelzer's personal property, including the furniture and furnishings of the marital home, would be distributed among Plaintiffs; (4) bank accounts held jointly between Mr. Gelzer and Defendant would pass to Defendant; and (5) all of Mr. Gelzer's remaining property would be distributed equally among Plaintiffs and Defendant, each receiving, individually, 25 percent of the total.

12.

Mr. Gelzer died in April, 1987.

13.

From May, 1983 until his death in 1987, Mr. Gelzer suffered numerous medical difficulties, including a stroke in May, 1983 and a second, more severe stroke in March, 1985.

14.

Mr. Gelzer's 1983 stroke required his hospitalization for five days in May, 1983.

15.

Mr. Gelzer's 1985 stroke, which was much more severe than the first, required his hospitalization for nearly six weeks. As a result of the 1985 stroke, commonly referred to as a "minor hemisphere" stroke, Mr. Gelzer suffered permanent impairment to the use of his left arm and leg.

16.

Moreover, during his hospitalization following the 1985 stroke, Mr. Gelzer was diagnosed as having cancer of the prostate, for which he received surgery on or around May 1, 1985.

17.

Following Mr. Gelzer's discharge from the hospital on May 7, 1985, he and Defendant returned to their home.

18.

Sometime in the summer of 1985, Defendant called Mr. Ellis, Mr. Gelzer's attorney, regarding some Eastern Airlines stocks or debentures. During that conversation, the subject of a power of attorney was raised, due to Defendant's recollection that a check or security had previously been returned because her signature on it alone was insufficient. In the course of their discussion, Defendant and Mr. Ellis agreed that Defendant needed to obtain Mr. Gelzer's power of attorney for the purposes of paying household and medical expenses, bills, etc.

19.

Accordingly, Mr. Ellis in a letter of August 8, 1985 sent to Defendant the forms necessary to execute the power of attorney. Included in those forms was the actual power of attorney, to be signed by Mr. Gelzer, and an affidavit to be signed by Dr. Dennison, Mr. Gelzer's treating physician, stating that in Dr. Dennison's opinion, Mr. Gelzer was competent to convey his power of attorney, and fully capable of understanding its significance.

20.

However, instead of taking Mr. Gelzer to be examined by Dr. Dennison, Defendant herself simply delivered the affidavit to Dr. Dennison, and assured him that Mr. Gelzer was in substantially the same condition as when he was discharged from the hospital in May, some three months previous. Based upon his conversation with Defendant, and without actually examining Mr. Gelzer, Dr. Dennison concluded that Mr. Gelzer was competent to convey the power of attorney, and thus signed the necessary affidavit.

21.

On August 16, 1985, Mr. Gelzer signed the document conveying upon Defendant his power of attorney. However, Mr. Gelzer's signature apparently was not properly witnessed and notarized in accordance with Mr. Ellis' previous instructions to Defendant. Although on its face the power of attorney appears to have been witnessed and notarized, evidence presented at the trial indicated that in fact neither signing party actually saw Mr. Gelzer sign the power of attorney. Nevertheless, Plaintiffs do not dispute the authenticity of Mr. Gelzer's signature itself.

22.

In this lawsuit, Plaintiffs seek to set aside two separate transactions which occurred subsequent to Mr. Gelzer's 1985 stroke.

23.

The first transaction about which Plaintiffs complain involves some 15,000 shares of Crawford & Co. stock acquired by Mr. Gelzer in the course of his employment with the company. Mr. Gelzer was the sole owner of the Crawford & Co. stock, and thus, under the terms of the 1974 will, it would be divided equally among Plaintiffs (75%, or 25% each) and Defendant (25%).

24.

However, a few days before October 2, 1985, Defendant went to the Lenox Square branch of the Trust Company Bank (the "bank"), where Mr. Gelzer and Defendant had an account. During this visit, Defendant spoke with Ms. Carol Culpepper, a Trust Company Bank "personal banker" who served as the Gelzers' private banker. Defendant advised Ms. Culpepper that Mr. Gelzer wished to add Defendant as a joint owner of the Crawford & Co. stock. After discussing the matter, Ms. Culpepper gave to Defendant a number of blank Stock/Bond Power forms to facilitate the requested transfer.

25.

On October 2, 1985, Defendant returned to the bank, at which time Defendant delivered to Ms. Culpepper the twenty-three Crawford & Co. stock certificates evidencing Mr. Gelzer's 15,000 shares of stock, as well as two Stock/Bond Power forms. The Stock/Bond Power forms bore Mr. Gelzer's signature, but were otherwise blank.

26.

Upon receipt of the stock certificates and blank, yet signed, Stock/Bond Power forms, Ms. Culpepper completed the Stock/Bond Power forms with the information necessary to transfer the shares of Crawford & Co. stock from Mr. Gelzer's sole ownership to Mr. Gelzer's and Defendant's joint ownership.

27.

In October, 1985, the Crawford & Co. stock had an approximate value of $340,-000.00.

28.

The second transaction about which Plaintiffs complain involves some 215 units or shares of Municipal Investment Trust (the "MIT securities") owned by Mr. Gelzer. Since Mr. Gelzer was the sole owner of the MIT securities, according to the terms of the 1974 will, they would be divided equally among Plaintiffs (75%, or 25% each) and Defendant (25%).

29.

However, on or about December 3, 1985, Defendant visited a local office of the Merrill, Lynch investment firm, and advised them that Mr. Gelzer wished to add Defendant as a joint owner of the MIT securities. Accordingly, a letter of December 3, 1985 was drafted and prepared for her signature, directing that Defendant be added as a joint owner of the MIT securities.

30.

Mr. Gelzer did not sign the letter of December 3, 1985. Rather, Defendant provided Mr. Gelzer's authority for the transfer by using the power of attorney previously conveyed upon Defendant by Mr. Gelzer in August, 1985.

31.

Accordingly, the MIT securities were reissued, not in Defendant's and Mr. Gelzer's names as joint owners, as requested, but rather in Defendant's name as sole owner.

32.

At the time of their transfer, the MIT securities had an approximate value of $30,000.00.

33.

Following Mr. Gelzer's death in April, 1987, Defendant sold both the house in which she had lived during her marriage to Mr. Eberhart and prior to her marriage to Mr. Gelzer, and the marital home shared with Mr. Gelzer. Defendant then moved to California, where she presently resides.

34.

Defendant at present retains sole ownership of both the Crawford & Co. stock and the MIT securities, and has not transferred or sold any of those assets since Mr. Gelzer's death.

**35.**

Pursuant to O.C.G.A. § 53–7–104, Plaintiffs bring this lawsuit as assignees of Trust Company Bank, Executor of Mr. Gelzer's estate under the terms of the 1974 will, following Trust Company Bank's own decision not to litigate the present claims against Defendant.

## CONTENTIONS OF THE PARTIES

**36.**

Plaintiffs contend that the above transactions were the result of Defendant's having defrauded Mr. Gelzer, and/or her exercise of undue influence over him. Plaintiffs in this lawsuit seek to set aside the transactions transferring ownership of the Crawford & Co. stock and the MIT securities to Defendant, and thus return those assets, as well as any dividends received therefrom, to the estate for equal distribution according to the terms of the will.

**37.**

Defendant contends that she neither fraudulently deceived Mr. Gelzer, nor exercised undue influence over him. Rather, Defendant argues that the above transactions were the result of Mr. Gelzer's own wishes to better provide for her upon his own death, and also upon Mr. Gelzer's recognition of the increased prosperity, and therefore decreased dependence, of his children in the years since the drafting of his 1974 will.

## CONCLUSIONS OF LAW

**38.**

Under the doctrine enumerated in *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), a federal court in a diversity case is required to apply the substantive law of the state in which the Court sits. *Crockett v. Uniroyal*, 772 F.2d 1524, 1529 (11th Cir.1985); *Goodwin v. George Fischer Foundry Systems, Inc.*, 769 F.2d 708, 711 (11th Cir. 1985). As a result, Georgia law governs the substantive issues in this case.

**39.**

As an initial matter, contrary to the contentions of the parties, the outcome of this case to a certain extent turns upon the initial question of the technical validity of the particular securities transfers at issue. Before addressing issues actually raised and argued at trial, the Court must satisfy itself that, in fact, the transfers themselves were technically valid in accordance with Georgia law governing transfers of securities. If the transfers themselves do not meet the technical requirements under Georgia law, the Court need not address the issues, discussed at length during the trial of this case, of Mr. Gelzer's alleged incompetence and of Defendant's alleged exercise of fraud and/or undue influence.

**40.**

In addition, the Court notes that the parties in their post-trial briefs provided lengthy discussions of Georgia law regarding gifts. However, this case involves two separate *transfers* of securities, the authority for one being contained in a signed Stock/Bond Power, and for the other being evidenced by a signed power of attorney. Therefore, the central issues for decision by the Court are: (1) the technical validity of the transfers themselves; and (2) if the transfers themselves were technically valid, whether they were procured through Defendant's use of fraud and/or undue influence due to the mental incapacity of Mr. Gelzer at the time the transfers were made. Thus, the central issue for the Court is not whether Mr. Gelzer intended to *make a gift* to Defendant, but rather whether he intended to *make the particular transfers of securities* to her which are at issue in this case. Thus, Georgia law regarding gifts applies only by analogy—in particular, as a source for applicable standards for determining, among other things, when a party *intended* to do a certain act, and when a party has been subjected to undue influence and/or fraud.

## I. TECHNICAL VALIDITY OF THE TRANSFERS

**41.**

Both the Crawford & Co. stock and the MIT securities are securities within the

meaning of Article 8 of the Uniform Commercial Code. *Grossman v. Glass*, 239 Ga. 319, 321, 236 S.E.2d 657 (1977). Accordingly, their transfer is governed by O.C.G.A. § 11–8–101, *et seq.*

42.

■ Under Georgia law, legal interest in a security is transferred upon the proper indorsement and delivery of the security. *See* O.C.G.A. §§ 11–8–301, 11–8–307, 11–8–309.

43.

■ As regards the technical validity of the transfer of the Crawford & Co. stock, proper indorsement of a security "is made when an appropriate person signs on it or on a separate document an assignment or transfer of the security or a power to assign or transfer it or when the signature of such person is written without more upon the back of the security." O.C.G.A. § 11–8–308(1). Thus, if a transfer is proper in all other respects, a Stock/Bond Power such as those involved in the present case would operate as a "separate document" for the purposes of satisfying the requirements of § 11–8–308(1) for transfer.

44.

■ Nevertheless, pursuant to O.C.G.A. § 11–8–311, an owner, here the executor of Mr. Gelzer's estate, may assert the ineffectiveness of an unauthorized indorsement against any purchaser other than a purchaser for value and without notice of adverse claims. Thus, Plaintiffs, as assignees of the executor's claims, may assert the ineffectiveness of the stock transfer at issue in the present case against Defendant, who undisputedly was not a good faith purchaser for value without notice.

45.

■ The Court concludes that the particular Stock/Bond Powers pursuant to which the Crawford & Co. stock was transferred satisfied the technical requirements of § 11–8–308(1) for valid transfer. Thus, the determination left for the Court is whether that otherwise valid transfer was the result of fraud and/or undue influence, as Plaintiffs contend.

46.

The question of the technical validity of the transfer of the MIT securities, in contrast, raises initial questions regarding the technical validity and nature of the power of attorney pursuant to which they were transferred.

47.

■ Georgia law does not require any particular form or method of execution with respect to powers of attorney, except that they must be executed with the same formality as the law prescribes for the execution of the act for which the power of attorney is given. *See* O.C.G.A. § 10–6–2; *Blanchard & Clahoun Realty Co. v. Comer*, 185 Ga. 448, 451, 195 S.E. 420 (1938) (for an agent to execute on behalf of his principal a contract which itself must be in writing, "the authority of the agent to execute it must likewise be in writing."); *Byrd v. Piha*, 165 Ga. 397, 400, 141 S.E. 48 (1927) (" 'The act creating the agency must be executed with the same formality (and need have no more) as the law prescribes for the execution of the act for which the agency is created.' "); *Hitchcock v. Mayfield*, 133 Ga. App. 546, 547, 211 S.E.2d 612 (1974) ("An authority for an agent to execute a contract in writing shall likewise be in writing.").

48.

■ Thus, regardless of Defendant's failure to follow Mr. Ellis' instructions and have Mr. Gelzer's signature of the power of attorney properly witnessed, the Court nevertheless finds that the power of attorney itself is technically valid as regards acts which themselves require no greater formality, which is the case here.

49.

However, remaining for the Court is the question of whether the particular power of attorney in this case in fact conveyed upon Defendant the specific power to effect the transfer of MIT securities at issue.

**50.**

Georgia law has historically construed powers of attorney strictly and in light of the four corners of the instrument. *First Nat'l Bank of Paulding County v. Cooper*, 252 Ga. 215, 216, 312 S.E.2d 607 (1984); *White v. Young*, 122 Ga. 830, 832, 51 S.E. 28 (1905) (The power of attorney "will be strictly construed, ... and the addition of general words will not be construed to extend the authority, so as to add new and distinct powers different from those expressly delegated.").

**51.**

Regardless of such strict construction, however, it is well settled that " 'the agent's authority shall be construed to include all necessary and usual means for effectually executing it.' " *Johnson v. Johnson*, 184 Ga. 783, 193 S.E. 345 (1937) (citations omitted).

**52.**

■ The agency relationship created by a power of attorney is a fiduciary one and is governed by the settled rules that prohibit the agent from taking any action adverse to the principal, or making a secret profit out of his agency. *Cooper* 252 Ga. at 216–17, 312 S.E.2d 607 (where power of attorney granted agent the general power to " 'buy, sell, mortgage, contract, hypothecate and in any way and every way and manner deal in and with goods, wares and merchandise, choses in action and other property in possession or in action, and to do every kind of business of what nature or kind soever' ", agent was not authorized to assign to bank a C/D owned by principal for the purpose of agent's securing a personal loan); *Franco v. Stein Steel*, 227 Ga. 92, 95, 179 S.E.2d 88 (1970), *cert. denied*, 402 U.S. 973, 91 S.Ct. 1661, 29 L.Ed.2d 137 (1971).

**53.**

According to the Court in *Franco*,
[t]he first duty of an agent is that of loyalty to his trust. Within the scope of his agency he cannot engage in the business of his principal for his personal benefit and profit. He cannot have any interest or do any act adverse to the interest of his principal, or which is incompatible with the application of his skill and diligence to the promotion of that interest. He cannot place himself in a position in which his duty and interest conflict with that of his principal, or be permitted to make a secret profit out of his agency.
227 Ga. at 95, 179 S.E.2d 88 (citations omitted).

**54.**

■ Thus, while an agent under a general power of attorney is not absolutely prohibited from making gifts of the principal's property under any circumstances, the authority to do so must be clearly established, either by the express language of the instrument or by extrinsic proof that evidences that the principal so intended. *LeCraw v. LeCraw*, 261 Ga. 98, 99, 401 S.E.2d 697 (1991) (general power of attorney conferred authority to make gifts of the principal's property where undisputed evidence established that the principal was competent and had shown a pattern of making monetary gifts in the past, was informed of the gifts and made no objections, was seeking legal advice regarding estate planning, and that the gifts were made both to "the natural objects of her bounty", and to reduce her estate's tax liability). Thus, "ascertainment of the intent of the parties plays an important role in construction of a power of attorney...." *Id.*

**55.**

■ In the present case, the Court finds that the power of attorney at issue in fact explicitly confers upon Defendant the power to effect the transfer of the MIT securities in question. Paragraph (8) of the power of attorney signed by Mr. Gelzer on August 16, 1985 provides as follows:
It is ... my intention ... to expressly giv[e] and grant[ ] unto my said attorney [Mrs. Gelzer, Defendant] full power:

. . . . .

(8) To buy, sell, exchange, pledge, hypothecate, mortgage, indorse for transfer or for any other purpose, register or

cause to be registered in the name of any nominee, deliver, assign, transfer and execute all necessary instruments of assignment and transfer, dispose of, provide for the safekeeping of, and otherwise deal with any stocks, bonds or other securities or any real or personal property whatsoever;

Power of Attorney, Joint Exhibit 29.

56.

Thus, the Court concludes that the power of attorney conveyed by Mr. Gelzer to Defendant expressly conveyed upon Defendant the authority to effect the transfer of the MIT securities at issue in this case. Moreover, Defendant presented evidence indicating that Mr. Gelzer reasonably intended to benefit Defendant, in light of his concern for his wife's future, and his alleged awareness of Plaintiffs' changed financial circumstances since the drafting of his 1974 will.

57.

As a result, the only determination remaining for the Court is whether Mr. Gelzer's signing of the power of attorney itself was a result of fraud and/or undue influence by Defendant, as Plaintiffs claim, thus invalidating any actions taken pursuant to that power of attorney.

## II. GEORGIA LAW REGARDING MENTAL INCOMPETENCE

58.

Georgia law presumes every man to be sane and competent, and as regards either the making of a contract or the giving of a gift, the burden is on the party attacking competency to prove the incompetency asserted. *Jones v. Smith*, 206 Ga. 162, 165, 56 S.E.2d 462 (1949); *Nelson v. State Farm Life Ins. Co.*, 178 Ga.App. 670, 672, 344 S.E.2d 492 (1986); *Gulf Life Ins. Co. v. Wilson*, 123 Ga.App. 631, 632, 181 S.E.2d 914 (1971) ("Mental or physical impairment is never presumed. It must be proved."); *Philpot v. Temple Banking Co.*, 3 Ga.App. 742, 750–51, 60 S.E. 480 (1908).

59.

Moreover, proof of a temporary loss of competency creates no presumption that it continued up to the time of execution of the transaction being challenged, and the burden remains on the party alleging incapacity to show such incapacity at the particular time of the transactions being challenged. *Jones*, 206 Ga. at 165, 56 S.E.2d 462; *Nelson*, 178 Ga.App. at 672, 344 S.E.2d 492 (burden to prove incompetence at the time of contracting not satisfied where only evidence established deceased's *physical* impairment, and not her *mental* impairment, at the time of the making of the contract); *Wilson*, 123 Ga.App. at 633, 181 S.E.2d 914; *Philpot*, 3 Ga.App. at 750–51, 60 S.E. 480.

60.

In *Jones*, the Court recognized that at the time of making the option in favor of his son at issue in that case, the donor

was 83 years of age and in very feeble health; that he was childish, forgetful, unable to remember events and persons, generally afflicted with the infirmities that accompany old age, and at times suffered from uremic poisoning, and that during such times his mental condition was bad, but, when this uremic poisoning was cleared up, his mental condition improved.

206 Ga. at 165, 56 S.E.2d 462. Nevertheless, testimonial evidence was presented establishing that on the particular day upon which the donor made the option in question, he was "as [mentally] clear ... as ... ever." *Id.* Based upon this evidence, the Court found the evidence to be "insufficient to show mental incapacity on the part of the maker of the option...." *Id.* at 166, 56 S.E.2d 462.

61.

To establish incapacity in a grantor, the grantor must be shown to have been, at the time the contract was made, *non compos mentis*, which means entirely without understanding. *Jones*, 206 Ga. at 165, 56 S.E.2d 462; *Nelson*, 178 Ga.App. at 672, 344 S.E.2d 492. One is not presumed

to be incompetent "merely because of illness or because he is not 'bright,' or because at times he was clear about matters and at other times he was not." *Wilson,* 123 Ga.App. at 633, 181 S.E.2d 914 (citations omitted). Furthermore, "[p]roof of weakness of mind, not amounting to imbecility, is not sufficient to warrant setting aside a contract, there being no proof of fraud or undue influence." *Boney v. Smallwood,* 202 Ga. 411, 416, 43 S.E.2d 271 (1947).

## III. GEORGIA LAW REGARDING UNDUE INFLUENCE AND FRAUD

### 62.

 Georgia law defines undue influence as "the exercise of sufficient control over the person, the validity of whose act is brought in question, to destroy his free agency and constrain him to do what he would not have done if such control had not been exercised." *Burroughs v. Reed,* 150 Ga. 724, 105 S.E. 290 (1920). To be "undue", and thus render the transaction void, the influence exerted must be such to deprive a party "of his free agency by substituting for his will that of another." *Scurry v. Cook,* 206 Ga. 876, 878, 59 S.E.2d 371 (1950).

### 63.

 Under Georgia law, husband and wife occupy a confidential relationship with each other. *See* O.C.G.A. § 23–2–58. *See also, ITT Commercial Finance Corp. v. Dilkes (in re Analytical Systems, Inc.),* 113 B.R. 91, 93–94 (N.D.Ga.1990), *aff'g* 97 B.R. 676 (N.D.Ga.1988); *Adair v. Adair,* 220 Ga. 852, 142 S.E.2d 251 (1965); *Sumner v. Sumner,* 121 Ga. 1, 6, 48 S.E. 727 (1904).

### 64.

 In addition, Georgia law provides that the agency relationship created by a power of attorney is of a fiduciary nature. *First Nat'l Bank of Paulding County v. Cooper,* 252 Ga. 215, 216, 312 S.E.2d 607 (1984); *Franco v. Stein Steel,* 227 Ga. 92, 95, 179 S.E.2d 88 (1970).

### 65.

Thus, the Court concludes that Defendant, as Mr. Gelzer's wife and agent under the power of attorney, enjoyed a relationship with Mr. Gelzer which was both confidential and fiduciary in nature.

### 66.

By statute in Georgia, "[a] gift by a person ... who is particularly susceptible to be unduly influenced by his parent, guardian, trustee, attorney or other person standing in a similar confidential relationship to one of such persons shall be closely scrutinized." O.C.G.A. § 40–5–86.

### 67.

 Accordingly, Georgia law raises a presumption of undue influence where the beneficiary stands in a confidential or fiduciary relationship with the donor, the donor is of weak mentality, and the beneficiary occupies a dominant position. *McGahee v. Walden,* 216 Ga. 352, 353, 116 S.E.2d 559 (1960); *Childs v. Shepard,* 213 Ga. 381, 382, 99 S.E.2d 129 (1957); *Trustees of Jesse Parker Williams Hosp. v. Nisbet,* 191 Ga. 821, 840, 14 S.E.2d 64 (1941); *Meyers v. Meyers,* 195 Ga.App. 529, 531, 394 S.E.2d 374 (1990).

### 68.

However, the mere showing of a confidential relationship between the donor and beneficiary is not sufficient to raise a presumption of undue influence. *Daniel v. Etheredge,* 198 Ga. 191, 200, 31 S.E.2d 181 (1944) ("[t]he relationship alone [does] not afford a substitute for allegations of fact touching fraud or undue influence"). Indeed, simply because two individuals have a confidential relationship, the use of some influence by one to gain a benefit for himself or herself is not prohibited as long as the influence is not undue. *Id.; Morgan v. Ivey,* 222 Ga. 850, 852, 152 S.E.2d 833 (1967).

### 69.

 Thus, to prove undue influence, it is not sufficient to show merely that a

person receiving substantial benefits occupied a confidential relationship to a donor and had an *opportunity* to exert undue influence. Rather, it must also be shown that the person receiving the gift occupied a dominant position over the donor, so that the donor's free will was destroyed and the donor in making the gift did something that he would not otherwise have done. *Morgan v. Ivey,* 222 Ga. at 852, 152 S.E.2d 833; *Gornto v. Gornto,* 217 Ga. 136, 142, 121 S.E.2d 139 (1961); *Daniel,* 198 Ga. at 200, 31 S.E.2d 181.

### 70.

Moreover, "'fraud may not be presumed.' Circumstances creating a mere suspicion are not sufficient...." *Watson v. Brown,* 186 Ga. 728, 731, 198 S.E. 732 (1938) (no evidence of fraud or undue influence where the only evidence established that donor and beneficiary often spent time together, and beneficiary was considerably younger than donor).

## IV. GEORGIA LAW REGARDING PRESUMPTIONS AND BURDENS OF PROOF

### 71.

■■■ In a diversity action, the effect of a presumption is a substantive question, requiring the application of state law. *See* Federal Rules of Evidence, Rule 302.

### 72.

■■■ Under Georgia law, although a plaintiff may present evidence which entitles him or her to the benefit of a presumption, the plaintiff still bears the initial burden of proof. *Miller v. Miller,* 258 Ga. 168, 169–70, 366 S.E.2d 682 (1988). The Court in *Miller* stated:

> Concerning the effect of a presumption on the burden of proof, the rule, generally, is that while a presumption operating in favor of the party having the ultimate burden of persuasion requires the opposing party to go forward with evidence rebutting the presumption, it does not shift the original burden of persuasion. That burden remains with the party upon whom it was originally cast.

*Id.* at 169, 366 S.E.2d 682.

### 73.

Indeed,

> [i]n all civil actions ... a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.

Federal Rules of Evidence, Rule 301.

### 74.

■■■ Thus, the Court concludes that the burdens of proof in the present case apply as follows: (1) Plaintiffs bear the initial burden of establishing a prima facie case indicating that Mr. Gelzer "was of weak mentality", and that Defendant "occupie[d] a position of dominance over" Mr. Gelzer at the time of the subject transactions. Such a showing by Plaintiffs raises a presumption of undue influence due to Defendant's confidential and fiduciary relationship with Mr. Gelzer. (2) Upon this initial showing by Plaintiffs, Defendant must present evidence rebutting that presumption. (3) Plaintiffs at all times bear the ultimate burden of proving by a preponderance of the evidence that the two transactions at issue in this case were, as a result of Mr. Gelzer's mental incompetence, the result of Defendant's exercise of fraud and/or undue influence.

## V. TRIAL TESTIMONY

### 75.

Testimony presented during the trial of this case was lengthy, much of it touching only tangentially upon the central issues to be decided. Nevertheless, the Court deems helpful here a brief summary of portions of the pertinent testimony presented.

### 76.

During the course of the trial, the Court heard testimony from numerous parties regarding, first, Mr. Gelzer's relationships with Plaintiffs and Defendant; second, uncharacteristic behaviors and customs which

Mr. Gelzer exhibited during the course of his marriage to Defendant, and especially after the two strokes; and third, the nature and effect of the various health problems from which Mr. Gelzer suffered.

77.

First, with regard to Defendant's and Mr. Gelzer's relationships with Plaintiffs and with each other, Plaintiffs themselves testified that Defendant did not get along well with Plaintiffs, and Plaintiffs did not feel welcome in Defendant's and Mr. Gelzer's home. Specifically, Plaintiffs related incidents such as an alleged argument between Jane and Defendant with regard to the cost of Jane's wedding, Defendant's not making Plaintiffs feel welcome in Defendant's and Mr. Gelzer's home, and Defendant's failure to inform Plaintiffs of either of Mr. Gelzer's strokes or to ask them to visit Mr. Gelzer during these times.

78.

It is noteworthy here that the parties do not dispute, and indeed the Court at the conclusion of the trial specifically found, that Mr. Gelzer in fact loved Plaintiffs very much, and also loved Defendant very much.

79.

Second, with regard to the behavioral changes noted in Mr. Gelzer during the course of his marriage to Defendant and especially following the 1985 stroke, Plaintiffs themselves testified that in 1981, Mr. Gelzer, usually a conscientious and stylish dresser, wore what was variously described as a green leisure or jumpsuit to a formal evening wedding.

80.

Plaintiffs further testified that in 1982, Mr. Gelzer uncharacteristically decided to temporarily move out of his own home, and live in Defendant's father's two-room apartment, in order to help Defendant provide in-home care for her father, who was at the time elderly and sick.

81.

Mr. Robert Penny, Mr. Gelzer's next-door neighbor since 1967, testified that following the 1985 stroke, Mr. Gelzer on one occasion did not recognize Mr. Penny and could not carry on a conversation with him,

and that on another occasion, Mr. Penny observed Mr. Gelzer relieving himself on Mr. Gelzer's front lawn, which Mr. Penny said was very uncharacteristic of Mr. Gelzer.

82.

Plaintiffs as well as Mr. Gelzer's neighbors testified that during this time, the upkeep and maintenance of Defendant's and Mr. Gelzer's home was allowed to deteriorate, though Mr. Gelzer previously had been meticulous about maintaining the house and yard.

83.

Plaintiffs testified that during this period, Mr. Gelzer, previously a lively conversationalist who loved telling jokes, was neither initiating nor responsive in conversation and became little more than an observer of events and conversations around him.

84.

Jane testified that during her 1985 pregnancy, subsequent to the 1985 stroke, Mr. Gelzer showed an uncharacteristic lack of concern for Jane's condition or, later, the child's birth.

85.

Plaintiffs also presented evidence that Defendant regularly purchased substantial amounts of liquor for Mr. Gelzer's consumption, although all of the witnesses testified that they had never seen Mr. Gelzer intoxicated.

86.

Finally, with regard to the specific health problems from which Mr. Gelzer allegedly suffered and their effects upon his mental acuity and competence following the 1985 stroke, Plaintiffs testified that beginning in the late 1970's and early 1980's, Plaintiffs themselves noticed a gradual decline in Mr. Gelzer's mental acuity that manifested itself in memory lapses and difficulty in carrying on sustained conversations.

87.

Plaintiffs further testified that this gradual decline in mental acuity increased sharply with Mr. Gelzer's 1985 stroke, with the result that he was virtually nonresponsive, noncommunicative, and merely an observer of people and events around him.

**88.**

Mr. Penny testified that following Mr. Gelzer's 1983 stroke, Mr. Gelzer did not look good, and appeared to have gained some weight. Mr. Penny further testified that following the 1985 stroke, Mr. Gelzer on one occasion did not recognize Mr. Penny, and could not carry on a conversation with him.

**89.**

Mr. Gelzer's nephew, John Schuessler, testified that when Mr. Schuessler and his father visited Mr. Gelzer during the summer after the 1985 stroke, Mr. Gelzer was similarly unable to carry on a conversation with them.

**90.**

Both Plaintiffs and Defendant testified that following the 1985 stroke, Mr. Gelzer's ability to write, particularly to sign his name legibly, declined.

**91.**

Plaintiffs presented evidence that as a result of his having had cataracts removed from both eyes, Mr. Gelzer's vision was impaired, with his corrected vision being 20/30 in one eye and 20/50 in the other. Plaintiffs presented further evidence that as a result of the cataracts, Mr. Gelzer's field of vision was reduced by approximately 50 percent.

**92.**

Mr. Penny's wife, Dale Penny, related an occasion following the 1985 stroke when she went into the Gelzers' home to check on Mr. Gelzer, and Mr. Gelzer, though lying in bed with his eyes open, did not respond to Ms. Penny's calling his name.

**93.**

Finally, Dr. Clifford R. Wheeless, Jr., Elise's husband, who is himself a practicing physician, though neither a neurologist or psychiatrist, testified that in January, 1985, prior to the 1985 stroke, he conducted a "mini-mental" examination on Mr. Gelzer, and it is his opinion that Mr. Gelzer was mentally incompetent at that time.

**94.**

Defendant presented evidence to the contrary. First, as regards her and Mr. Gelzer's apparently strained relationship with Plaintiffs, Defendant agreed with Plaintiffs that they had had some difficulties getting along, but disagreed as to the extent of the discord, and testified that she had never *intended* to make Plaintiffs feel unwelcome in Defendant's and Mr. Gelzer's home.

**95.**

Second, with regard to Mr. Gelzer's alleged uncharacteristic behavior during the course of their marriage, and particularly following the 1985 stroke, Defendant testified that during this period, Mr. Gelzer behaved as he wished; that is, that Defendant did not influence Mr. Gelzer's behavior, especially on such occasions as when Mr. Gelzer apparently wore a green leisure or jumpsuit to a formal wedding. Defendant further testified that Mr. Gelzer *wanted* to move into Defendant's father's apartment in order to assist Defendant in taking care of her father.

**96.**

Finally, with regard to the alleged sharp decline in Mr. Gelzer's mental acuity following the 1985 stroke, Defendant testified that she observed no such sharp decline, and indeed perceived Mr. Gelzer as being very much aware of his surroundings, his business and financial affairs, and his dealings with and regarding other people.

**97.**

In support of Defendant's testimony on this issue, Defendant also presented the testimony of Ms. Bessie Chandler, a practical nurse who attended to Mr. Gelzer in the Gelzer home for approximately six months during the latter part of 1986 and early 1987. Ms. Chandler testified that during this period, she found Mr. Gelzer to be mentally competent and aware of his surroundings. Ms. Chandler further testified that she frequently carried on conversations with Mr. Gelzer, and observed him watching television, reading the newspaper, and reading the mail.

**98.**

The medical testimony presented during the course of the trial was likewise conflicting. First, Plaintiffs presented the testi-

mony of Dr. David B. Dennison, Mr. Gelzer's treating physician following the 1985 stroke. Dr. Dennison testified that although Mr. Gelzer was responsive and his disposition pleasant, Dr. Dennison was not able to carry on an extended conversation with him. Dr. Dennison further testified that it is his opinion that Mr. Gelzer at that time could not have understood the ramifications of the transactions in question, and further that if Mr. Gelzer had wished to execute a will during that period, Dr. Dennison would have been unwilling to attest to his capacity to do so.

99.

Plaintiffs also offered the expert testimony of Dr. Alan Stoudemire, the Chief of Psychiatry at Emory University Hospital in Atlanta. Dr. Stoudemire was never Mr. Gelzer's treating physician, nor did he ever meet Mr. Gelzer. Nevertheless, based upon Mr. Gelzer's medical records and Plaintiffs' accounts of his behavior, Dr. Stoudemire testified that it is his belief that Mr. Gelzer was suffering from a "cascade" or series of cerebrovascular accidents, representing a progressive deterioration in his condition that in all likelihood began before 1983. Dr. Stoudemire further testified that Mr. Gelzer's changes in behavior following the 1985 stroke strongly suggested that he was suffering from cerebrovascular dementia, characterized by Dr. Stoudemire as a global impairment of the central nervous system which impairs a person's memory and ability to make reasoned judgments. Dr. Stoudemire testified that a person who is chronically ill and unable to care for himself develops an almost child-like dependency on his caretaker and would be very much prone to manipulation and domination. Finally, Dr. Stoudemire testified that it is his opinion that Mr. Gelzer could not have understood the nature and consequences of the transactions in question.

100.

Defendant, in contrast, offered the testimony of Dr. William Eubanks, an opthalmologist whom Mr. Gelzer visited following the 1985 stroke. According to Dr. Eubanks, Mr. Gelzer was able accurately to relate his recent medical history, and was also able to cooperate in performing the eye examination, following Dr. Eubanks' instructions as given. Moreover, as regards Mr. Gelzer's vision, Dr. Eubanks testified that Mr. Gelzer's corrected vision was 20/30 in one eye and 20/50 in the other. Dr. Eubanks further testified that although Mr. Gelzer suffered from a loss of field of vision, that is, that he could see only approximately half of a normal field of vision, that he would nevertheless have been able to read newspapers, bank statements, and letters, as well as to watch television.

101.

Defendant also offered the testimony of Mr. William Miller, a financial adviser who had prepared the Gelzers' income tax returns for several years. Mr. Miller testified that he spoke with Mr. Gelzer on the telephone following the 1985 stroke, during which conversation they discussed joint ownership of property in the context of discussing financial needs for Mr. Gelzer's medical care.

102.

Finally, Defendant offered the expert testimony of Dr. Ronald Koenig, a neurologist currently practicing in the Atlanta area. Like Dr. Stoudemire, Dr. Koenig was at no time Mr. Gelzer's treating physician, nor did he ever meet Mr. Gelzer. Based upon Mr. Gelzer's medical records for the period, Dr. Koenig testified that it was his belief that Mr. Gelzer's mental condition in October, 1985 was sound, and that Mr. Gelzer at that time would have been able to make reasoned judgments with respect to financial transactions such as those at issue in this case.

VI. CONCLUSIONS

103.

Briefly, the Court concludes that Plaintiffs in this case have failed to satisfy their burden of proof with regard to their claims that Defendant either fraudulently deceived Mr. Gelzer, or exercised undue influence over him, due to Mr. Gelzer's alleged mental incompetence at the time of the transactions at issue in this case.

#### 104.

■ With regard to the issue of Mr. Gelzer's alleged incompetence, medical testimony offered on this point was directly conflicting, both from those physicians who actually had occasion to examine and interact with Mr. Gelzer, and those who did not, basing their testimony instead on Mr. Gelzer's medical records.

#### 105.

Observational testimony proffered by those who were in the company of Mr. Gelzer during the period in question is likewise contradictory. Plaintiffs, Mr. Penny and Mr. Schuessler testify that Mr. Gelzer was, following the 1985 stroke, unable to carry on a conversation, and that in their opinion, he could not have understood the implications of the transactions in question. In contrast, Defendant, Ms. Chandler, and Mr. Ellis testify that Mr. Gelzer in fact was able to carry on a normal conversation during the period in question, and that in their opinion, he was fully able to understand the implications of the transactions at issue in this case.

#### 106.

In light of such conflicting medical and observational testimony, the Court cannot conclude that Plaintiffs have met their burden of proof with regard to Mr. Gelzer's alleged mental incompetence at the time of the transactions in question.

#### 107.

■ Moreover, as regards Plaintiffs' allegations of fraud and/or undue influence, the Court likewise finds that Plaintiffs have failed to meet their burden of proof. *At the most,* testimony presented during the trial established that, first, during the course of Mr. Gelzer's marriage to Defendant, Mr. Gelzer exhibited some uncharacteristic behavior, such as dressing inappropriately for a wedding and becoming more lenient with the upkeep of his home and yard.

#### 108.

Second, Plaintiffs *at the very most* established that following the 1985 stroke:

(1) Defendant kept up with and executed various financial transactions for the couple, such as paying the bills, purchasing a van, writing checks, etc.; (2) Defendant regularly purchased substantial amounts of liquor for Mr. Gelzer's consumption, though none of the witnesses had ever seen Mr. Gelzer intoxicated; and (3) Defendant did not keep Plaintiffs well informed with regard to Mr. Gelzer's declining health.

#### 109.

Regardless of the above showings by Plaintiffs, the Court nevertheless concludes that they have failed to present any proof whatsoever that Defendant actually either defrauded Mr. Gelzer, or exercised undue influence over him. In fact, Plaintiffs have explicitly shown no more "control" of the situation on Defendant's part than would naturally be expected of the healthy spouse of a very ill, 78–year–old man. Plaintiffs likewise have failed to present any proof whatsoever that Defendant in fact manipulated Mr. Gelzer, either by fraudulently deceiving him, or by substituting her will for his own.

#### 110.

Indeed, this conclusion is bolstered by the observations of Mr. Miller, Mr. Ellis, and Ms. Chandler, all of whom spent time with the couple during the period in question, and none of whom saw any evidence of fraud and/or undue influence in either Defendant's conduct toward Mr. Gelzer, or in her handling of the couple's financial transactions, including those at issue in this case.

#### 111.

As stated before, under Georgia law, such a showing of mere *opportunity* for deception or undue influence is not sufficient to meet Plaintiff's heavy burden in this case. *See supra.*

#### 112.

Moreover, the Court finds reasonable and credible Defendant's contentions that she in fact handled the couple's financial transactions out of her love and concern for her husband of, at that time, 12 years.

#### 113.

The Court also finds reasonable and credible Defendant's contentions that Mr. Gel-

zer indeed *intended* to effect the transfers at issue in this case, based upon Mr. Gelzer's concern for his wife of, at that time, 12 years, whom the parties do not dispute Mr. Gelzer loved very much, as well as his recognition that Plaintiffs' financial circumstances had changed quite drastically since the drafting of his 1974 will, and that as a result Plaintiffs did not need as much financial assistance from him.

114.

In summary, the Court finds that Plaintiffs have failed to meet their burden of proof with regard to either Mr. Gelzer's alleged mental incompetence, or Defendant's alleged exercise of fraud and/or undue influence over him, at the time of the transactions in question.

115.

The Court recognizes that under Georgia law, a presumption of undue influence necessarily arises in a case involving a spouse/caretaker who benefits from transfers of assets such as those at issue in this case. Nevertheless, the Court finds that Defendant has adequately rebutted that presumption through testimony presented to the contrary.

116.

Moreover, regardless of such presumptions, Plaintiffs still must bear the ultimate burden of proof with regard to their claims of fraud and/or undue influence.

117.

The Court thus concludes that Defendant is entitled to judgment in this case. Specifically, the Court concludes that both of the transfers at issue in this case are valid, and as a result declines to set them aside as Plaintiffs request.

118.

Pursuant to Rules 52 and 58 of the Federal Rules of Civil Procedure, the Court hereby enters judgment for the Defendant.

So ORDERED.