**In the Matter of James O. TAYLOR, Debtor.**

**James O. Taylor, Plaintiff,**

v.

**Riverside–Franklin Properties, Inc., f/k/a Clifton, Lipford & Taylor, P.C., Defendant.**

**Bankruptcy No. 97–53323–JDW. Adversary No. 98–5007.**

United States Bankruptcy Court, M.D. Georgia, Macon Division.

Dec. 1, 1998.

---

Jerome L. Kaplan, and James P. Smith, Arnall, Golden & Gregory, LLP, Macon, GA, for debtor.

Wesley J. Boyer, Katz, Flatau, Popson, & Rover, Macon, GA, for Riverside–Franklin Properties, Inc.

Mark Roadarmel, Assistant U.S. Trustee, Macon, GA.

### MEMORANDUM OPINION

JAMES D. WALKER, JR., Bankruptcy Judge.

This matter comes before the Court on Motion For Summary Judgment Or In The Alternative Partial Summary Judgment filed by Riverside–Franklin Properties, Inc. ("Movant") in response to a Complaint To Avoid a Fraudulent Transfer filed by James O. Taylor ("Debtor"). Debtor has filed a Cross-motion For Partial Summary Judgment on the complaint. This is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(H). After considering the pleadings, evidence and applicable authorities, the Court enters the following findings of fact and conclusions of law in compliance with Federal Rule of Bankruptcy Procedure 7052.

### Findings of Fact

Debtor is a former employee of Movant.[1] In June 1996, Debtor and a senior member of Movant, Mr. J. Russell Lipford, Jr. ("Lipford"), discussed Debtor's departure from the firm.[2] Debtor, at the time, owned 293 shares of Movant's common stock. In 1986, each shareholder had executed a stock retirement agreement ("1986 agreement") providing for continuity in the management and policies of the corporation. The agreement provided that upon termination, for whatever reason, of the employment of a stockholder, the stockholder was obligated to sell to Movant, and Movant was obligated to buy the

---

1. Movant was formerly an accounting firm operating under the name Clifton, Lipford & Taylor, P.C. ("CLT"). Subsequent to Debtor's departure from the firm, the remaining members formed a new limited liability company called Clifton, Lipford, Hardison & Parker, L.L.C. CLT no longer engages in accounting practice, but continues to own an office building. Its name has been changed to Riverside–Franklin Properties, Inc.

2. In the late 1980's, Movant was engaged, through Debtor, to assist a client with estate planning. Debtor recommended a large insurance policy which he procured from his brother-in-law. As a result of this arrangement, Debtor received a $200,000.00 commission on the sale of the policy. After the insurance company became insolvent, litigation ensued. Movant has been sued for a sum in excess of four million dollars on a claim arising out of the transaction and other of Debtor's actions. Lipford suggested that Debtor resign from the firm upon learning of Debtor's actions.

stockholder's stock at a price determined by a formula contained in the agreement.[3] However, the stock certificate itself failed to note the existence of this restriction.

On July 15, 1996, Debtor sent Lipford a letter proposing to resign and stating that he would forward terms for redeeming his stock. On July 22, 1996, Debtor sent a letter stating proposed terms of his resignation and his offer for redeeming his stock.[4] Lipford then sent Debtor a document containing proposed terms of Debtor's resignation which responded to each of the terms proposed by Debtor in his July 22 letter. This proposed agreement contained a space at the end where Debtor could sign and date the agreement if he agreed. Debtor signed and dated the agreement ("1996 agreement") on July 24, 1996.[5] The 1996 agreement provided

**3.** The relevant portion of the agreement provides:

> Upon the termination of employment of any Stockholder for any reason, including ... retirement ... the terminated Stockholder ... shall be obligated to sell all of the terminated ... Stockholder's shares in the Corporation owned as of the date of his termination of employment.... Immediately upon the termination of employment ... the terminated Stockholder ... shall offer in writing to sell the Corporation, for the price and upon the terms determined under Paragraphs 3 and 4 respectively, all of the shares owned by the terminated ... Stockholder as of his termination.... All of the shares required to be offered shall be purchased by the Corporation within thirty (30) days after receipt of the written offer by the Corporation.

(Lipford Aff.Ex. E). The formula, contained in Paragraph 3 of the agreement, is calculated as follows:

> Unless and until changed by unanimous consent of the Stockholders, it is agreed that, for the purpose of determining the purchase price to be paid for the interest of a Stockholder, the price for each share of stock shall be determined as follows:
> (a) First calculate the respective Stockholder's gross fees attributable to that Stockholder for each of the five (5) fiscal years of the Corporation immediately preceding the fiscal year during which the offer is made under Paragraph 1 or during which that Stockholder's employment terminates, thus causing Paragraph 2 to apply. The allocation of gross fees among the Stockholders shall be on the basis of client origination, not on the basis of the services actually rendered by the respective Stockholder and shall be in accordance with the accounting principles established in good faith from time to time by the Board of Directors of the Corporation. Such gross fees for those five (5) fiscal years shall then be averaged with one-half (1/2) of such five (5) year average being the tentative aggregate purchase price, provided, however, that there shall be substituted for one-half (1/2) of such five (5) year average (1/2) of the respective Stockholder's gross fees for the one fiscal year immediately preceding the fiscal year during which the offer is made or that Stockholder's employment terminates if one-half (1/2) of the gross fees for that one (1) year are less than one-half (1/2) of the five (5) year average.
> (b) The aggregate purchase price determined under Subparagraph (a), above, shall then be divided by the number of shares of the Corporation's stock owned by the respective Stockholder on the date of the offer or the termination of employment.
> Any determination of the purchase price determined in good faith by the Board of Directors of the Corporation pursuant to this Paragraph 3 shall be conclusive, final, and binding on all of the parties hereto, and the Board members shall jointly and severally be held harmless by the parties for making such determination.

*Id.* This formula was later amended as follows:

> On the first anniversary of the shareholder's termination the amount determined in Paragraph 3(a) will be adjusted by 50% of the fees included in the computation of Paragraph 3(a) generated by clients (originated by the terminated shareholder) no longer serviced by the firm after the end of the one year period.
> The remaining payments to the terminated shareholder will be adjusted according to this computation.

(Lipford Aff.Ex. F).

**4.** In his July 22, 1996 letter to Lipford, Debtor stated that the 1986 agreement allowed him to make an offer to the shareholders to retire the stock or the formula contained within the agreement would control. The Court finds no such language in the agreement supporting the contention that the stock could be retired under the agreement for any price other than that determined by the formula. Such an option is, however, routinely utilized in such situations so that parties may negotiate a settlement which may vary from the terms of the agreement to the mutual agreement and benefit of the parties.

**5.** Debtor appears to challenge the validity of this agreement on the grounds of incapacity and duress claiming that he was depressed at the time the 1996 agreement was entered into, and that he was coerced into signing the agreement because of Lipford's threat to disclose to CLT staff the reasons for Debtor's termination if he did not sign the agreement. The parties have not requested that this Court determine the validity of the settlement agreement in these motions for summary judgment, and the Court will not proceed to do so on its own initiative.

that, in exchange for Debtor's stock, Movant would:

1) release fifteen clients and client files to Debtor;

2) remove Debtor from loan guarantees in excess of $500,000.00;

3) return life insurance policies, in face amounts of $1,000,000.00, free of assignments, to Debtor;

4) pay $299.42 in premiums on disability policies on Debtor through September 1996;

5) pay Debtor's July 1996 auto allowance of $550.00;

6) pay Debtor's July practice development bill of $750.00;

7) cancel a non-compete agreement which would have prevented Debtor from conducting an accounting practice in Bibb and its contiguous counties for two years;

8) release Debtor from future liabilities of Movant other than malpractice, fraud, or other negligent acts committed by Debtor;

9) pay Debtor's regular salary through August 15, 1996, totaling $5,208.33;

10) "treat [Debtor's] departure in a respectful manner in dealing with the public" due to Debtor's fears that leaks of his activities could tarnish his reputation and interfere with his ability to continue a successful accounting practice;

11) permit Debtor to either keep his computer and pay the balance, or turn the computer into Movant; and

12) release two Northwestern life insurance policies having approximately $16,000.00 in cash value to Debtor on January 1, 1997.

On July 26, 1996, Debtor indorsed the rear of his stock certificate evidencing the 293 shares he owned and delivered the certificate to Movant.

Soon after Debtor's departure, Movant began receiving checks issued by trustees of various bankruptcy estates made payable to Movant. Movant was unable to find any accounts receivable corresponding to these payments. After investigating, Movant discovered that while still its employee, Debtor had been depositing these checks in his personal checking account. The checks were payment for services performed by Debtor for the bankruptcy trustees. The amount of checks deposited by Debtor in his personal account totaled $28,717.25. Movant was paid $25,762.73 by American States Insurance Company, which provided Movant with a fidelity bond on its employees. Debtor repaid the remaining $2,954.52. Because of its payment to Movant, American States placed a claim on the two Northwestern life insurance policies that were to be released to Debtor pursuant to the 1996 agreement. The policies had a cash surrender value of approximately $16,000.00. As a result, Debtor has not yet received these policies.

Since departing as an employee of Movant, Debtor has begun his own accounting practice out of his home, earning on average approximately $9,000.00 per month. At the end of 1996, Debtor's business was valued by the parties at approximately $170,000.00. This estimate is attributable to clients released to Debtor by Movant, as well as new clients acquired by Debtor since his departure.

On July 25, 1997, Debtor filed a petition seeking relief under Chapter 13 of the Bankruptcy Code. The Chapter 13 was subsequently converted to a Chapter 11 after a claim filed by the Internal Revenue Service caused Debtor's debts to exceed Chapter 13's limit. On January 22, 1998, Debtor, acting as debtor-in-possession, filed a complaint alleging that the stock transfer was avoidable as a fraudulent conveyance under section 548(a)(2) of the Bankruptcy Code. Movant filed a motion for summary judgment or, in the alternative, partial summary judgment claiming that the transfer was not fraudulent under section 548(a)(2) because 1) the transfer occurred more than one year before Debtor filed his bankruptcy petition, 2) Debtor received reasonably equivalent value under the settlement agreement in exchange for the stock, and 3) Debtor was not rendered insolvent as a result of the transfer. In the alternative, Movant claims that even if the transfer was fraudulent, it is protected by the good faith exception contained in section 548(c), and that if Debtor is entitled to any recovery at all, it should be limited to return of the stock certificate itself, rather

than its value. Debtor responded with a cross-motion for partial summary judgment on his claim that the transfer occurred within one year of the filing of his bankruptcy petition, and that he became insolvent as a result of the transfer.

### Conclusions of Law

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c).[6] If there is a material fact in dispute, summary judgment must be denied. *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir.1983). In other words, the Court must decide "whether the evidence presents a sufficient disagreement to require submission to [the factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Where some facts are in dispute—so that, ultimately, the case must go before the factfinder—but others are not, the court may, upon motion by a party, "ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted." FED.R.CIV.P. 56(d). This partial summary judgment is "a pre-trial adjudication that certain issues are established for trial of the case." *FDIC v. Massingill*, 24 F.3d 768, 774 (5th Cir.1994).

▬ Debtor's complaint alleges that the transfer of the stock certificate as part of the settlement agreement is voidable as a fraudulent transfer under section 548 of the Bankruptcy Code. Section 548 provides, in pertinent part:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that

was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

. . . .

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

11 U.S.C. § 548(a)(2).[7] Therefore, in order to avoid a transfer made by the debtor as fraudulent, 1) the transfer must have occurred on or within one year before the debtor filed a bankruptcy petition; 2) the debtor must have received less than reasonably equivalent value for the transferred property; and 3) the transfer must either have been made at a time when the debtor was insolvent, or have rendered the debtor insolvent. The burden of proving a fraudulent transfer is on the party challenging the transfer. *See Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.)*, 904 F.2d 588, 593–94 (11th Cir.1990).

▬ If the party challenging the transfer prevails, the court will award that party, "for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from . . . the initial transferee of such transfer." 11 U.S.C. § 550(a)(1). However, if the transferee took the property for value and in good faith, then the recovery may only be awarded to the extent that the transfer is avoidable. *Id.* § 548(c). The transferee has the burden of proving it is eligible for this good faith exception. 5 KING, COLLIER ON BANKRUPTCY, ¶ 548.10, p. 548–81 (15th ed.1998).

▬ "Actions to set aside alleged fraudulent conveyances are fact intensive by nature.

---

6. Rule 56 is made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7056.

7. Section 548(a)(2) has been subsequently designated 548(a)(1)(B) by amendment of the Religious Liberty and Charitable Donation Protection Act of 1998, Pub.L. No. 105–183, effective for

cases pending or commenced on or after June 19, 1998. Because this case was commenced prior to June 19, 1998, and the amendment is not relevant to these proceedings, the prior designation of section 548(a)(2) will be used for purposes of this opinion.

Thus, the Court is hesitant to decide such matters at the summary judgment stage of litigation." *Tidwell v. Gilbert (In re Grimes)*, case no. 95–52723 (Bankr.M.D.Ga. March 3, 1997) (Walker, J.). In this case, the Court grants summary judgment on the issues of whether the transfer of Debtor's interest in the stock certificate occurred within one year of the filing of his bankruptcy petition, and whether Movant is entitled to the good faith exception under section 548(c). As to all other issues, material facts are in dispute that render summary judgment on those issues inappropriate.

## I. Date of Transfer and Reasonably Equivalent Value

Section 548(a) allows the trustee or debtor-in-possession to avoid only those transfers made, or those obligations incurred, by the debtor within one year before the date of the filing of the petition. In addition, those transfers or obligations incurred by the debtor within one year before the filing of the bankruptcy petition are only avoidable if the debtor did not receive reasonably equivalent value in exchange for the transfer or obligation incurred.

The parties dispute whether the transaction at issue in this case falls within this one year statute of limitations and whether Debtor received reasonably equivalent value in exchange for the stock. The timing dispute results from a disagreement over whether the one year time limit began to run when Debtor entered into the 1996 agreement on July 24, 1996, or when the stock certificate was indorsed and delivered on July 26, 1996. The valuation dispute results from a disagreement over whether the stock's value is determined by the formula contained in the 1986 agreement, the 1996 agreement, or a fair market value. Neither Movant nor Debtor appear to have considered the effect that Movant's failure to note the restriction on the transferability of the stock on Debtor's stock certificate has on the outcome of these disputes.

The 1986 agreement obligates shareholders whose employment with Movant has terminated to sell their stock to Movant and requires Movant to purchase the stock at a price set by a formula contained in the agreement. O.C.G.A. § 14–2–627(a) provides that "an agreement among shareholders, or an agreement between shareholders and the corporation may impose restrictions on the transfer . . . of shares of the corporation." Such restrictions are "valid and enforceable against the holder [of the shares] or a transferee of the holder." *Id.* § 14–2–627(b). Thus, shareholders can restrict the potential market for their shares to a single entity. However, section 14–2–627(b) further provides that such restrictions are only valid and enforceable against the holder or a transferee of the holder "if the restriction['s] . . . existence is noted conspicuously on the front or back of the certificate." If the restriction is not so noted, the "restriction is not enforceable against a person without knowledge of the restriction." *Id. See also* O.C.G.A. § 11–8–204. Here, Movant admits that the restriction contained in the 1986 agreement was not noted at all on the front or back of Debtor's stock certificate. Therefore, the restriction is not enforceable against a transferee who has no knowledge of the restriction. As a result, Movant's failure to note the restriction created a market for the stock among any entity with no knowledge of the restriction.

Section 548(d)(1) is the operative section for determining the time a transfer for purposes of section 548(a) is "made." *Butler v. Lomas and Nettleton Co.*, 862 F.2d 1015, 1017–18 (3d Cir.1988). Section 548(d)(1) provides that a transfer is made when no subsequent bona fide purchaser from the debtor can obtain an interest greater than that obtained by the transferee.[8] "State law governs when a transfer is perfected against bona fide purchasers." *Butler*, 862 F.2d at 1018. Thus, this Court must

---

8. The statute states, in pertinent part, as follows:
 For purposes of this section, a transfer is made when such transfer is so perfected that a bona fide purchase from the debtor against whom applicable law permits such transfer to be per- fected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee. . . .
 11 U.S.C. § 548(d)(1).

turn to Georgia law to determine when Movant attained such an interest in the stock certificate that no bona fide purchaser from Debtor could have attained a greater interest.

A corporate common stock certificate is a security governed by Article 8 of the Uniform Commercial Code. *Wheeless v. Gelzer*, 780 F.Supp. 1373, 1379–80 (N.D.Ga. 1991) (citing *Grossman v. Glass*, 239 Ga. 319, 321, 236 S.E.2d 657, 659 (1977)) ("[T]he word security referred to in [O.C.G.A. § 11–8–317] includes and embraces common stock in corporations...."). Article 8 of the Uniform Commercial Code is codified in the Official Code of Georgia Annotated at sections 11–8–101, et seq. "Under Georgia law, legal interest in a security is transferred upon the proper indorsement and delivery of the security." *Wheeless*, 780 F.Supp. at 1380 (citing O.C.G.A. §§ 11–8–301, –307, –309).[9] Therefore, for purposes of section 548(a), the transfer occurred when Debtor indorsed the certificate and transferred it to Movant.

The facts are not in dispute as to when delivery and indorsement of the stock certificate occurred. The parties agree that the 1996 agreement was executed by Debtor on July 24, 1996. Debtor indorsed the certificate on July 26, 1996, and delivered it to Movant on that same day. (Mov.'s Brief Supp. Summ.J. at 6); (Debtor's Brief Supp. Part. Summ.J. at 3). Debtor's petition was filed on July 25, 1997, within one year of this transfer. There being no dispute as to any material fact on the issue of when the stock transfer occurred, the Court can decide, as a matter of law, that the stock certificate was transferred by Debtor to Movant within one year of the filing of Debtor's bankruptcy petition.

Movant attempts to avoid this result by arguing that the Court should not focus on when the transfer of the stock certificate occurred, but rather when the obligation to transfer the stock was incurred, i.e. when the 1996 agreement was signed. It is then that Movant claims the rights of the parties were fixed. In framing this argument, Movant is relying on the language in section 548 that says "The trustee may avoid any transfer of an interest of the debtor in property, *or any obligation incurred by the debtor.*" 11 U.S.C. § 548(a) (emphasis added). Movant claims that the obligation was incurred when Debtor signed the 1996 agreement on July 24, 1996, which occurred outside the one year period, thus entitling Movant to full summary judgment on its claim that section 548 does not apply to this transfer.[10]

---

9. These cited sections provide, in pertinent part, as follows:

> Upon transfer of a security to a purchaser (Code Section 11–8–313), the purchaser acquires the rights in the security which his transferor had or had actual authority to convey....

O.C.G.A. § 11–8–301(1) (1994). O.C.G.A. § 11–8–313 provides that a "(1) [t]ransfer of a security ... to a purchaser occurs only: (a) At the time he ... acquires possession of a certificated security."

> If a certificated security in registered form has been delivered to a purchaser without a necessary indorsement he may become a bona fide purchaser only as of the time the indorsement is supplied; but against the transferor, the transfer is complete upon delivery and the purchaser has a specifically enforceable right to have any necessary indorsement supplied.

*Id.* § 11–8–307.

> An indorsement of a certificated security, whether special or in blank, does not constitute a transfer until delivery of the certificated security on which it appears....

*Id.* § 11–8–309.

10. If the 1996 agreement modified the 1986 agreement, and the amount of compensation Debtor was to receive under the 1996 agreement was reduced without adequate consideration to an amount less than what Debtor would have received under the 1986 agreement, then by entering into the 1996 agreement, Debtor would have reduced the price Movant would have been obligated to pay Debtor in exchange for Debtor's stock under the 1986 agreement. Such debt forgiveness would reduce the estate of an insolvent debtor to the detriment of the debtor's creditors. If these were the facts of this case, Movant would be correct in asserting that *a* transfer occurred on the date of the agreement. Debtor executed the 1996 agreement on July 24, 1996, more than one year before his bankruptcy petition was filed on July 25, 1997. Therefore, Debtor would have incurred the obligation in the form of debt forgiveness outside the statute of limitations provided in section 548 and the transaction would be immune from challenge by the trustee or debtor-in-possession. Debtor's claim, however, is not based on any theory of debt forgiveness, but is instead based on the alleged inadequacy in value received in exchange for the stock.

The Court is not persuaded by this argument. The Court cannot simply look to when the obligation was incurred if there was a subsequent transfer of Debtor's property. The purpose of section 548 is to protect and conserve the debtor's estate for creditors. 5 KING, COLLIER ON BANKRUPTCY, ¶ 548.02[2], p. 548–13 (15th ed.1998). Thus, the "moment of importance [is] the actual time at which the estate is diminished from the creditors' viewpoint." *Id.* The debtor's estate is not diminished by the mere making of an agreement to transfer property. Such agreements are subject to rejection and breach. Rather, the estate is diminished at the moment the actual transfer occurs and Debtor becomes incapable of transferring the stock to any other purchaser.

Movant relies on two cases in support of its argument. In the first case, *Fitzgerald v. Cheverie (In re Edward Harvey Co.),* 68 B.R. 851 (Bankr.D.Mass.1987), the debtor entered into a settlement agreement with his lessor agreeing to release a leasehold interest in exchange for concessions from the lessor. *Id.* at 855. Shortly thereafter, an involuntary bankruptcy petition was filed against the debtor. *Id.* Initially, the Court notes that there was no serious dispute about whether the transfer occurred within one year of the filing of the involuntary petition. *Id.* at 858. Movant relies on the case, however, because the court found that the settlement agreement operated to transfer the debtor's leasehold interest. *Id.* at 856–58. But the operative effect of the settlement agreement in *Harvey* is distinguishable from the operative effect of the agreement in this case. In *Harvey,* it was the agreement itself "by which the [d]ebtor's leasehold interest was actually terminated." *Id.* at 856. Because the agreement itself served to terminate the debtor's leasehold interest, and as a result, diminish the debtor's estate, the agreement, in that case, constituted a transfer for purposes of section 548.

The 1996 agreement in this case does not have the same legally operative effect on Debtor's interest in the stock certificate. The agreement in this case was just that—an *agreement* to terminate Debtor's interest in the stock certificate. But to actually termi-nate that interest, Debtor had to indorse and deliver the certificate to Movant. It was at the point of indorsement and delivery that Debtor's estate was diminished, not upon entering into the agreement. Up to that point, Debtor had the legal authority to transfer the stock to another purchaser. Thus, *Harvey* does not suggest a result different from that reached in this case.

The next case relied on by Movant in support of its argument is *Dews v. Dews (In re Dews),* 152 B.R. 982 (D.Colo.1993). In *Dews,* the debtor entered into an "assignment agreement" on March 21, 1986 with his ex-wife in which he assigned to her an interest in a partnership. *Id.* at 983. Due to the other partners' rejection of this original assignment, a new assignment was signed three years later on April 7, 1989. *Id.* at 983–84. On April 4, 1990, within one year of the new assignment, the debtor filed his bankruptcy petition. *Id.* at 984. The assignment of the business interest was challenged as a fraudulent transfer. However, the court concluded that the transfer of the debtor's interest occurred at the time the original assignment agreement was executed four years earlier. *Id.* at 985. Thus, section 548 did not apply. Movant claims that this case supports its argument that the 1996 agreement constitutes the point of transfer. However, *Dews* does not support this argument. The transfer in *Dews* did not result from operation of the agreement, but rather from operation of the assignment that was also executed on March 21, 1986. In *Dews,* the court determined that, under Colorado law,

> a partner's assignment of his interest in the partnership ... entitles the assignee to the profits which would have been due the assigning partner.... [A] purported transfer of a partnership interest absent the consent of the other partners nevertheless conveys an interest in the profits of the venture.... The right to these profits is an interest in property under Colorado law.... Therefore, [the debtor] transferred to [the assignee] an interest in property on March 21, 1986....

*Id.* (citations omitted). Thus, the court in *Dews* did as this Court does now. It consulted state law to determine the moment of

transfer of the debtor's interest and learned that under Colorado law, the transfer of the debtor's interest in partnership profits occurred when the partnership interest was assigned. It was not the agreement that operated to effect the transfer of the partnership interest, but rather the assignment that was executed with the agreement. Similarly, under Georgia law, the transfer of an interest in a stock certificate does not occur by mere agreement. Rather, the certificate must be indorsed and delivered to the transferee. *Wheeless,* 780 F.Supp. at 1380. Therefore, as with *Harvey, Dews* does not suggest a result different from that reached in this case. The parties do not dispute that indorsement and delivery occurred within one year of Debtor filing his bankruptcy petition. Therefore, Debtor is entitled to summary judgment on this issue.

 The Court next considers the question of whether Debtor received reasonably equivalent value from Movant in exchange for the stock. "Reasonably equivalent value is determined by review of all the facts and circumstances of the case." *Harvey,* 68 B.R. at 858. At a minimum, the evidence must establish the value of the property transferred and the value Debtor received at the time of transfer. There is no such evidence here. The parties themselves are not in agreement as to the fair market value of the stock or the value Debtor received under the 1996 agreement. As a result, material questions of fact exist rendering summary judgment on this issue impossible.

Movant claims that because the transfer occurred as the result of a compromise contained in a settlement agreement, the Court need only find that the settlement was in the range of a reasonable measure of the value of the stock. *See Erie Marine Enters., Inc. v. Algoma Cent. Marine (In re Erie Marine Enters., Inc.),* 213 B.R. 799, 803 (Bankr.

W.D.Pa.1997). While this may be true, the Court cannot make that determination. A material question of fact exists as to the value of the 293 shares of stock transferred by Debtor to Movant. Movant suggests that the value of the stock is determined by applying the formula contained in the 1986 agreement. But the 1986 agreement does not appear to establish the stock's value. Rather, as modified by the 1996 agreement, it only appears to establish the value Movant was obligated to give Debtor in exchange for the stock. As previously stated, because the stock certificate did not contain a legend, thereby enabling transfer of the stock to a bona fide purchaser without notice, the stock had a fair market value separate from the agreement. If Movant provided Debtor with exactly the amount of value required under the 1996 agreement, that fact would be irrelevant to the determination of whether Debtor received reasonably equivalent value for the stock. That fact would only suggest that Movant satisfied its contractual obligations to Debtor. But the Court's inquiry must be into whether this value received by Debtor was reasonably equivalent to the fair market value of the stock.[11] The Court has no evidence of the actual fair market value of the stock at the time of the transfer. Without knowing the fair market value of the stock, the Court cannot determine whether the consideration Debtor received was reasonably equivalent to that fair market value, and as a result, cannot render summary judgment on this issue.

In addition, material questions of fact exist as to the value of the consideration received by Debtor. For example, the 1996 agreement releases Debtor from personal guarantees on corporate debts totaling approximately $500,000.00. Debtor contends that such a release is worthless because no member of the corporation had ever been called upon to satisfy a guarantee. Movant, on the other hand, contends such a release did provide

11. It is important to note that, if at trial, the Court finds that the value of the benefits received by Debtor in exchange for the stock was greater than the fair market value of the stock yet less than the value Debtor was entitled to receive under either the stock retirement agreement or the settlement agreement—whichever controls the value Movant was obligated to provide to Debtor in exchange for the stock—then Debtor would still be left with a contract claim for damages resulting from Movant's incomplete performance of its contractual obligations. Such a contractual claim by Debtor may lie under the pleadings as they currently stand. However, such a claim, if it exists, has not yet been proven.

value to the Debtor. It is impossible for the Court to make a factual determination as to the value of this release at the summary judgment stage of this litigation.

Movant also contends that releasing Debtor from liability to the firm for anything other than negligence or malpractice gave value to Debtor. Movant claims this was particularly valuable to Debtor because of Debtor's potential liability for depositing in Debtor's personal checking account the checks made payable to Movant by bankruptcy trustees. Debtor disputes this release has any value for two reasons. First, Debtor claims that he suffers no potential liability for depositing those checks in his account because the amounts were compensation for services provided by Debtor independent from his employment with the corporation. Thus Debtor claims the release protects him from nothing. Second, Debtor claims that even if he were liable for intercepting the checks, because the release did not cover negligence and malpractice, he would still be subject to such claims. Again, it is impossible for this Court to determine that the value of the release is not subject to factual dispute.

Summary judgment must be denied when there is a material fact in dispute. The fair market value of the stock and the consideration received by Debtor in exchange for the stock are material facts essential to the determination of the issue of whether Debtor received a reasonably equivalent value for the transfer of his stock. These values are in dispute. Therefore, Movant's motion for summary judgment on this issue is denied.

II. *Insolvency*

Genuine issues of material fact also still exist on the issue of whether Debtor became insolvent as a result of the stock transfer. Section 101(32) of the Bankruptcy Code defines "insolvent" as a

financial condition such that the sum of such entity's debts is greater than all such entity's property, at a fair valuation, exclusive of—(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors;

and (ii) property that may be exempted from property of the estate under section 522 of this title.

11 U.S.C. § 101(32). Thus, the balance sheet test is used under which a debtor will be declared insolvent if its debts exceed its assets (exclusive of exempt and fraudulently transferred assets). *Pinto v. Philadelphia Fresh Food Terminal Corp. (In re Pinto),* 98 B.R. 200, 209–10 (Bankr.E.D.Pa.1989), *rev'd on other grounds,* No. CIV.A. 89–3233, 1989 WL 234516 (E.D.Pa. Aug. 25, 1989).

In calculating the debtor's balance sheet, the court should consider only those assets "readily susceptible to liquidation and the payment of debts," *Briden v. Foley,* 776 F.2d 379, 382 (1st Cir.1985), and only those debts that are valid under applicable state or federal law, *see Braunstein v. Karger (In re Melon Produce, Inc.),* 122 B.R. 641, 644 (D.Mass.1991), *aff'd,* 976 F.2d 71 (1st Cir.1992) (citing *Pinto,* 98 B.R. at 208 n. 3); 5 KING, COLLIER ON BANKRUPTCY, ¶ 101.32, p. 101–118 (5th ed.1996). Assets are to be given a "fair valuation," 11 U.S.C. § 101(32), i.e. an "estimate ... of what can be realized out of the assets within a reasonable time either through collection or sale at the regular market value." *Pinto,* 98 B.R. at 210. Contingent assets and liabilities must also be included. However, to avoid declaring a debtor solvent or insolvent based on an event that may never happen, the value of such assets or liabilities must be reduced to present value based on the likelihood that the contingency will occur. *In re Xonics Photochemical, Inc.,* 841 F.2d 198, 199–200 (7th Cir.1988). *Accord Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.),* 904 F.2d 588, 594 (11th Cir.1990).

The Court cannot render summary judgment on the issue of Debtor's solvency or insolvency as a result of the transfer because what constituted Debtor's assets and debts before and after the moment of transfer is in dispute. Debtor claims that he was solvent with a net worth of $155,522.16 before the transfer. After the transfer, Debtor claims he was insolvent with a negative net

worth of $525,395.32.[12] The largest portion of Debtor's liabilities are stated in proofs of claim filed by the Internal Revenue Service ("IRS") and the State of Georgia Department of Revenue. Movant notes that Debtor was unaware of these tax claims at the time of the transfer. However, Debtor's liability, if any, existed apart from any knowledge of such a liability. A claim under section 548(a)(2) alleges a constructively fraudulent transfer, where fraud is presumed from the circumstances surrounding the transfer. There is no requirement under this section that the debtor be aware of his financial circumstances at the time of the transfer, or that a debtor have any intent to defraud his creditors. Claims that a debtor made a transfer with the intent to defraud his creditors are brought under section 548(a)(1). Thus, because this transfer is challenged under section 548(a)(2), this Court will not consider what Debtor knew about his financial position at the time of the transfer; instead, this Court will consider what his financial position actually was at the time of the transfer.

At the time of this transfer, Debtor was liable for taxes owed to the IRS for tax years 1989, 1990, 1994, and 1995, and taxes owed to Georgia Department of Revenue for the 1995 tax year. The Court has no evidence before it showing that these claims are not valid under state or federal law. Therefore, Debtor's tax debt for these years must be considered in the calculation of his insolvency at the time of transfer.

However, the Court cannot determine Debtor's liability at the time of the transfer on July 26, 1996 for taxes incurred in tax year 1996. If Debtor was not liable for taxes on income received in tax year 1996 until the end of Debtor's annual accounting period, which ended on December 31, 1996, then no portion of the tax claims for 1996 should be included in Debtor's insolvency analysis. On the other hand, if at the time of transfer, Debtor was liable for those taxes attributable to January 1, 1996 through July 26, 1996,

then that portion of the tax claims for 1996 should be included in the analysis. This is a question of law that the parties did not address in their briefs to this Court. Thus, without the parties having fully presented their arguments to the Court on this issue, it would be premature for the Court to decide this issue at this time.

In addition, a material question of fact remains as to the fair market value of Debtor's stock at the time of transfer. Movant makes no attempt to establish a market value for the stock. Debtor, on the other hand, makes several attempts. In his brief, Debtor estimates the stock's value at somewhere between $688,000.00 and $1,382,190.37. In his insolvency analysis exhibit, Debtor values the stock at $720,875.00. Thus, there is a dispute as to the value of the stock.

There is also a dispute as to the value of the Northwestern Mutual Life Insurance policies with an approximate cash value of $16,-000.00. Debtor disputes that the policies have any value because Movant's bonding company, American States Insurance Company, placed a lien on the policies as a result of having paid Movant $25,762.73 because of Debtor's interception of the checks issued to Movant by bankruptcy trustees. Movant has maintained these policies but has yet to release them to Debtor. Until it can be decided who will receive the proceeds from these policies, their value is uncertain and subject to dispute.

Finally, a question of fact exists as to the proper valuation of Debtor's debt as co-signor on a mortgage note. While this would seem a liability of the Debtor that is contingent on non-payment by the primary mortgagee, proof of the likelihood of default is a vital element of this determination. The Court is not in a position to estimate this debt based on the undisputed evidence. Because these questions of the value of Debtor's assets and liabilities at the time of transfer remain as disputed, Movant's motion and Debtor's cross-motion for summary judg-

---

**12.** The Court notes for the sake of accuracy that according to the assets listed in Exhibit A attached to Debtor's Cross-motion for Summary Judgment, these figures are incorrect. Debtor failed to include the $69,500 First Macon Bank CD in his calculation of assets. With this asset included in the Debtor's calculation of solvency, he would have had a net worth of $225,022.16 before the transfer, and a negative net worth of $455,895.32 after the transfer.

ment on the issue of Debtor's insolvency as a result of the transfer are denied.

### III. *Good Faith Exception*

 Movant argues that even if the transfer of the stock certificate is avoidable as a fraudulent transfer under section 548(a)(2), the Court should find that Movant is entitled to the good faith exception under section 548(c) as a matter of law. Section 548(c) provides that if the transferee received the fraudulently transferred property for value and in good faith, then the recovery the debtor receives is reduced to the extent value was given. Debtor does not dispute that Movant is entitled to the protection of the good faith exception. Therefore, Movant is entitled to summary judgment on this issue. However, as noted previously, there is substantial dispute as to the value given by Movant to Debtor in exchange for the stock. Therefore, the extent to which Movant would be protected by the exception if the transfer is deemed at trial to have been fraudulent is a question of fact to be resolved at trial.

### IV. *Debtor's Recovery: Return of the Stock Certificate or Monetary Award*

Finally, Movant claims that it is entitled to summary judgment on the issue of the form of recovery Debtor would receive if the transfer is found to have been fraudulent. When a transfer is avoidable under section 548, the party challenging the transfer is entitled to recover, for the benefit of the estate, either 1) the property transferred, or 2) if the court so orders, the value of such property. 11 U.S.C. § 550(a). The Code provides little guidance about which remedy is appropriate in particular circumstances. *Kelley v. GMAC (In re Farmer)*, 209 B.R. 1022, 1024 (Bankr.M.D.Ga.1997) (Walker, J.). However, section 550 suggests a preference for recovery of the transferred property by requiring that the value of the property only be awarded "if the court so orders." There is no such limiting language for awarding the property itself. *Id.* at 1025. This preference comports better with the purpose of the section which is to "restore the financial condition of the estate to the state in which it would have been had the transfer not oc-

curred." *Id.* at 1024–25. On the other hand, a recovery of the stock in a discontinued accounting firm could be an empty victory.

The Court is unable to determine from the undisputed evidence which remedy would best restore Debtor's estate to the financial state it would have been in had the transfer not occurred. As a result, Movant's motion for summary judgment on this issue is denied. At trial, due consideration will be given to the circumstances of the case, including steps taken by the parties after the transfer and before the filing of this case to change their positions in reliance on the validity of the transfer.