In re VISION METALS, INC.,
et al., Debtors.

Vision Metals, Inc., Plaintiff,

v.

SMS Demag, Inc., Defendant.

Bankruptcy No. 00–4205 (MFW).
Adversary No. 02–6528.

United States Bankruptcy Court,
D. Delaware.

May 26, 2005.

Kimberly Lawson, Esq., Richard Allen Keuler, Jr., Esq., Reed Smith LLP, Wilmington, DE, J. Frank McKenna, Esq., Albert Bates, Jr. IV, Esq., Pittsburgh, PA, for SMS Demag, Inc.

Neil B. Glassman, Esq., Steven M. Yoder, Esq., Ashley B. Stitzer, Esq., The Bayard Firm, Wilmington, DE, Kenneth Oestreicher, Esq., Howard R. Feldman, Esq., Kristin P. Herber, Esq., Whiteford, Taylor, & Preston, Baltimore, MD, for Vision Metals, Inc.

## MEMORANDUM OPINION [1]

MARY F. WALRATH, Chief Judge.

This matter is before the Court on the Motion for Judgment on the Pleadings filed by SMS Demag, Inc. ("Demag") asserting that Vision Metals, Inc. ("Vision") has failed to state a claim on which relief can be granted in Counts I–IV of its Complaint.[2] For the reasons stated herein, the

---

1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

2. This is the second Motion for Judgment on the Pleadings filed by Demag. On July 14,

2004, the Court granted Demag's first Motion and dismissed Counts V and VI of Vision's Complaint. *Vision Metals, Inc. v. SMS Demag, Inc. (In re Vision Metals, Inc.)*, 311 B.R. 692 (Bankr.D.Del.2004).

Court will grant Demag's Motion.[3]

## I. BACKGROUND

Vision manufactured pipes, tubes, and other metal products from its facility in Rosenberg, Texas. On December 10, 1997, Vision contracted with Demag to design, sell, maintain, and supervise the installation of equipment capable of meeting specific performance guarantees ("the Original Agreement") for an Assel and Stretch Reducing Mill Project ("the Assel Mill"). The original contract price for Demag's equipment and services was $16,542,000.

Subsequently, the Assel Mill failed to meet the specific performance guarantees as required by the Original Agreement. Because Demag purportedly had the specialized knowledge to correct the performance problems, Demag and Vision entered into another agreement on August 17, 2000 ("the First Agreement"), whereby, inter alia, Demag agreed to continue to provide parts and services in order to bring the Assel Mill into compliance with the performance guarantees and to release Vision from its obligation to make a payment due of $864,300. In exchange, Vision executed a "Certificate of Final Acceptance" acknowledging that the Assel Mill was complete and released its claims against Demag. Any rights and obligations that the parties had in the future were to be based solely on the terms of the First Agreement.

On November 13, 2000, Vision filed a petition under chapter 11 of the Bankruptcy Code. At that time, the Assel Mill was still not functioning properly. Nonetheless to obtain Demag's continuing support, Vision filed a Motion for Authority to Assume the First Agreement. The Court approved the assumption of the First

Agreement as being in the best interests of Vision, the estate, and its creditors. Pursuant to the Assumption Motion, Vision agreed to make four equal payments of $25,846 to Demag from January to April 2001 and to pay $16,023.90 for spare parts.

By March 2001, the Assel Mill was still not fully functional. In a further effort to address those problems, Vision and Demag entered into a second agreement on March 7, 2001 ("the Second Agreement"). Under that Agreement, Demag agreed to continue to provide services to Vision and the parties setoff certain claims they had against each other ($62,000 owed to Vision and $52,000 owed to Demag). For its remaining $10,000 claim, Vision agreed to accept a $20,000 credit for the purchase of spare parts from Demag. Vision did not file any motion for approval of the Second Agreement, and, consequently, the Court never authorized Vision's execution of it.

On November 11, 2002, Vision filed a Complaint against Demag seeking to avoid and recover alleged preferential transfers, fraudulent conveyances, and post-petition transfers. On December 18, 2003, Demag filed a Motion for Judgment on the Pleadings as to Counts V and VI of the Complaint. In those Counts, Vision sought to vacate the Order authorizing Vision to assume the First Agreement and sought a declaratory judgment that Demag was equitably estopped from arguing that the Assumption Order barred Vision from asserting claims for breach of the Original Agreement. Vision filed a Motion seeking authority to amend those Counts of its Complaint. On July 14, 2004, the Court granted Demag's Motion for Judgment on the Pleadings and denied Vision's Motion to Amend the Complaint.

---

**3.** Although Demag filed a request for oral argument, the Court finds oral argument un-

necessary and renders its decision based on the pleadings.

On September 20, 2004, Demag filed the instant Motion for Judgment on the Pleadings as to the remaining Counts of the Complaint. Vision opposes the Motion. The Motion has been fully briefed and is ripe for decision.

## II. JURISDICTION

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 & 157(b)(2)(A), (E), (H), & (O).

## III. DISCUSSION

Demag asserts in its Motion for Judgment on the Pleadings that Vision's Complaint fails to state a claim upon which relief can be granted for the preferential, post-petition transfer, and fraudulent conveyance claims asserted.

### A. Standard of Review

In reviewing a motion for judgment on the pleadings under Rule 12(c), courts apply the same standard as a motion under Rule 12(b)(6) for failure to state a claim upon which relief may be granted. *See, e.g., Turbe v. Gov't of Virgin Islands*, 938 F.2d 427, 428 (3d Cir.1991). The court must "accept the allegations in the complaint as true, and draw all reasonable factual inferences in favor of the plaintiff." *Id.* The moving party must establish that no material issue of fact remains to be resolved and that the party is entitled to judgment as a matter of law. *See, e.g., National Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc.*, 991 F.2d 426, 428 (8th Cir.1993); *In re Mobile Tool Int'l, Inc.*, 306 B.R. 778, 779–80 (Bankr.D.Del. 2004).

### B. Count I—Preferences

In Count I of its Complaint, Vision seeks to avoid, as preferential transfers, the payments and other concessions it made pursuant to the First Agreement.

Because the First Agreement was assumed by Vision, however, it may not recover those payments as preferences. *See, e.g., Kimmelman v. The Port Auth. of N.Y. and N.J. (In re Kiwi Int'l Air Lines, Inc.)*, 344 F.3d 311, 323 (3d Cir.2003) (holding that "the trustee's preference actions against each of the defendants was precluded, as a matter of law, by the debtor's earlier assumption of its agreements with them....").

Because Count V of the Complaint (which sought to vacate the assumption order) was denied, Vision now concedes that Count I of its Complaint is no longer viable. Therefore, the Motion will be granted as to Count I.

### C. Count II—Post–Petition Transfers

Vision alleges that $151,177.71 in post-petition transfers to Demag were made without Court authorization. Thus, it asserts that those transfers are avoidable under section 549(a). Demag contends that the transfers were either authorized by the Court or authorized by the Bankruptcy Code because they were made in the ordinary course of business. Therefore, Demag argues they are not avoidable under section 549.

Section 549(a) of the Bankruptcy Code allows a trustee, or a debtor in possession, to avoid a transfer of property of the estate that is not authorized by the court or by the Bankruptcy Code. 11 U.S.C. § 549(a). Court authorization is required to transfer property of the estate whenever that transfer occurs outside the debtor's ordinary course of business. 11 U.S.C. § 363(b)(1). On the other hand, when a chapter 11 debtor in possession continues to operate its business, as permitted by section 1108, no court authorization is necessary for the debtor to enter transactions that fall within the ordinary course of its business. 11 U.S.C. § 363(c)(1).

### 1. *Authorized by the Court*

■ Demag asserts that some of the post-petition transfers were authorized by the Court because they were paid pursuant to the First Agreement. The Court authorized Vision to assume the First Agreement; therefore, payments made pursuant to that Agreement were authorized by the Court. *See, e.g., Armstrong v. Dakota Bank & Trust Co. (In re Knudson)*, 943 F.2d 877, 878 (8th Cir.1991) (holding that the trustee could not avoid a security interest under section 549 when that security interest was authorized by the bankruptcy court); *Musika v. Arbutus Shopping Ctr. Ltd. P'ship (In re Farm Fresh Supermarkets of Md., Inc.)*, 257 B.R. 770, 772 (Bankr.D.Md.2001) ("Having obtained the approval of this Court for the assumption and assignment of the lease, the trustee cannot now recover . . . the amount that the trustee paid to cure the defaulted rent. . . . because it was authorized by the Court pursuant to 11 U.S.C. § 365.").

Therefore, to the extent that the post-petition payments sought to be recovered by Vision are attributable to amounts owed under the First Agreement, those payments were authorized by the Court and are not subject to avoidance under section 549. Vision acknowledges this and agrees that $79,049.90 was transferred pursuant to the First Agreement and cannot be avoided under section 549.

### 2. *Ordinary Course of Business*

Vision asserts, however, that the remaining $72,127.81 in post-petition transfers to Demag were made pursuant to the Second Agreement, which was never approved by the Court. Accordingly, Vision asserts that those transfers may be avoided under section 549. Demag disagrees, arguing that the transfers were in the ordinary course of Vision's business and did not need Court approval. *See, e.g., In re Mr. Gatti's*, 164 B.R. 929, 945 (Bankr. W.D.Tex.1994) ("Therefore, when property of the estate is transferred [in the ordinary course of business] the Code prevents such transfers from later being avoided.").

■ "[T]he courts have engaged in a two-step inquiry for determining whether a transaction is in 'the ordinary course of business': a 'horizontal dimension' test and a 'vertical dimension' test." *In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir.1992) (*citing* Benjamin Weintraub & Alan Resnick, *The Meaning of "Ordinary Course of Business" Under the Bankruptcy Code—Vertical and Horizontal Analysis*, 19 UCC L.J. 364 (1987)). *See also* 3 *Collier on Bankruptcy*, ¶ 363.03[1] (Alan N. Resnick & Henry J. Sommer eds., Matthew Bender 2004) (explaining the vertical and horizontal dimension tests).

#### a. *Horizontal Dimension*

The first step, the "horizontal dimension" test, considers "whether from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry." *Roth Am.*, 975 F.2d at 953. *See also Martino v. First Nat'l Bank (In re Garofalo's Finer Foods)*, 164 B.R. 955, 962–63 (Bankr.N.D.Ill.1994), *aff'd in part and rev'd in part*, 186 B.R. 414 (N.D.Ill.1995).

Vision argues that the Second Agreement was not entered in the ordinary course of its business. It asserts that, at that time, it was a producer of carbon and alloy hot finish, cold drawn, and welded steel tubing for the automotive, utility, energy, and general manufacturing markets. Thus, Vision argues that the construction of the Assel Mill was a transaction outside the ordinary course of its business. *See, e.g., Lackawanna Iron & Coal Co. v. Farmers' Loan & Trust Co.*, 176 U.S. 298, 315–16, 20 S.Ct. 363, 44 L.Ed. 475 (1900)

(holding that extensive reconstruction of a railway, tantamount to new construction, was an extraordinary expenditure deemed to occur outside the course of the railroad's business).

█ It is not, however, the construction of the Assel Mill under the Original Agreement that is at issue here. The transfers at issue were not made pursuant to the Original Agreement but pursuant to the Second Agreement. The inquiry is whether the Second Agreement was in the ordinary course of Vision's business. Once the First Agreement was assumed, Vision issued the Certificate of Final Acceptance acknowledging that all work under the Original Agreement was completed. Accordingly, as of that date the Assel Mill was deemed to be complete. The Second Agreement dealt not with the building of the Assel Mill but only with the servicing of the Assel Mill.

█ It is not unusual for a company to maintain and repair its facilities. That is done in the ordinary course of business in Vision's or any other industry. Once a capital improvement is deemed to be complete, costs associated with maintaining and repairing that improvement are generally ordinary course of business expenses. *See, e.g., Harrison v. Estate of Deutscher,* 115 B.R. 592, 599 (M.D.Tenn.1990) (holding that boat repair was done in the ordinary course of business of river transportation company); *In re Morning Star Ranch Resorts,* 64 B.R. 818, 821–22 (Bankr.D.Colo.1986) (stating that receiver that takes possession of property is expected to pay for necessary repairs).

Vision argues, however, that the Second Agreement was not simply an ordinary course of business repair contract. The Second Agreement included the settlement of certain claims between Vision and Demag which arose under the First Agreement. Specifically, in the Second Agreement, the parties detailed the various claims they had against each other under the First Agreement[4] and offset them against each other with the remaining claim of Vision (totaling $10,000) being satisfied by a $20,000 credit for purchase of spare parts from Demag.

The resolution of such issues, including the acknowledgment of mutual claims against each other and the agreement to set them off, is an ordinary course of business transaction. In fact such resolutions occur every day in every industry.

b. *Vertical Dimension*

The second step, the "vertical dimension" test, considers the creditors' expectations and whether the economic risk of the transaction is different from those accepted by creditors that extended credit to the debtor pre-petition. *See, e.g., In re James A. Phillips, Inc.,* 29 B.R. 391, 394 (S.D.N.Y.1983) (concluding that "ordinariness" is a creditor's expectation of transactions a debtor is likely to undertake in the ordinary course of business).

Vision argues that the transactions are not ordinary because creditors would not have expected to be subjected to the risks inherent in the Second Agreement without notice and Court approval. However, once again, the issue presented is not whether creditors would have expected Vision to give them notice of the construction of the Assel Mill. The subject of the Second Agreement was the continued servicing of the Assel Mill. As noted above, repairing equipment is done everyday and creditors expect those expenses to be paid in the ordinary course of business. *See, e.g.,*

---

**4.** The Second Agreement noted that Vision was owed $62,000 by Demag and Demag was owed $52,000 by Vision under the First Agreement.

*Harrison,* 115 B.R. at 599; *Morning Star Ranch Resorts,* 64 B.R. at 821–22.

Vision argues, however, that the Second Agreement also involved the resolution of claims between Vision and Demag that required notice and approval. Fed. R. Bankr.P. 9019. *See, e.g., Peltz v. Gulfcoast Workstation Group (In re Bridge Info. Sys.),* 293 B.R. 479, 485 (Bankr.E.D.Mo. 2003) (holding that, because the alleged settlement was never approved by the court under Rule 9019, the settlement agreement was unenforceable); *In re Leslie Fay Cos.,* 168 B.R. 294, 305 (Bankr. S.D.N.Y.1995) ("Compromises may not be made in bankruptcy absent notice and a hearing and a court order. . . . The Memorandum purported to settle significant disputes between the Union and Leslie Fay without notice to anyone. Thus, for this reason, too, the Memorandum is unenforceable."). *But see, Pineo v. Turner (In re Turner),* 274 B.R. 675, 681 (Bankr. W.D.Pa.2002) (holding that an unapproved settlement agreement is binding on the parties even though not yet approved by the court). *See also, Valucci v. Glickman, Berkovitz, Levinson & Weiner (In re Glickman, Berkovitz, Levinson & Weiner),* 204 B.R. 450, 455 (E.D.Pa.1997) ("releases are likened to the post-petition sale of an asset, i.e., the cause of action, and should be reviewed by the bankruptcy court pursuant to § 363(b).").

When considered from the perspective of creditors, however, the Court is not convinced that creditors would have expected notice of the Second Agreement. Having received notice that the First Agreement was approved, which acknowledged that the Assel Mill was completed and provided only for ongoing servicing of the Mill, creditors would have expected Vision to deal with the repair of the Mill in the ordinary course of its business. The claims between Vision and Demag that are settled and setoff under the Second Agreement are de minimus in comparison to the original price of the Assel Mill and in absolute terms. They are not so significant that creditors would expect notice and Court approval.

■ "Section 363 is designed to allow a trustee (or debtor-in-possession) the flexibility to engage in ordinary transactions without unnecessary creditor and bankruptcy court oversight, while protecting creditors by giving them an opportunity to be heard when transactions are not ordinary." *Roth Am.,* 975 F.2d at 952.

Consequently, the Court concludes that the parties executed the Second Agreement in the ordinary course of Vision's business. It, and any transfers made pursuant to it, may not be avoided under section 549. Therefore, Demag's motion to dismiss Count II of Vision's Complaint will be granted.

### D. *Counts III and IV—Fraudulent Transfers*

■ In its Complaint, Vision alleges that payments it made to Demag pre-petition were constructively fraudulent because Vision received less than reasonably equivalent value at a time when it was insolvent, had unreasonably small capital, or had incurred debts beyond its ability to repay as they matured. Vision asserts that it is entitled to avoid $15,467,755.87 in transfers to Demag dating back to February 1998. 11 U.S.C. § 548(a); Tex. Bus. & Com.Code Ann. §§ 24.005–8. In short, Vision argues that it paid Demag to erect an Assel Mill that is worthless because it does not work.

Demag contends, however, that Vision has failed to state a claim under either bankruptcy or Texas law because the Court's approval of the First Agreement precludes Vision from attempting to over-

turn the result of that approval through a subsequent fraudulent conveyance action.

Vision argues that the mere fact that the Original Agreement was deemed to be satisfied by the terms of the assumed First Agreement does not render the transfers made equivalent to that which was received. As stated by the Court in *Taylor v. Riverside–Franklin Prop. (In re Taylor)*, 228 B.R. 491 (Bankr.M.D.Ga.1998):

> If Movant provided Debtor with exactly the amount of value required under the 1996 agreement, that fact would be irrelevant to the determination of whether Debtor received reasonably equivalent value for the stock. That fact would only suggest that Movant satisfied its contractual obligations to Debtor. But the Court's inquiry must be into whether this value received by Debtor was reasonably equivalent to the fair market value of the stock.

228 B.R. at 501. *See also In re Nelsen*, 24 B.R. 701, 702 (Bankr.D.Or.1982) ("[C]ontract cases... are inapplicable for the reason that 'reasonably equivalent value' or 'fair equivalent' within the meaning of 11 U.S.C. § 548(a)(2)(A) or Section 3 of the Uniform Fraudulent Conveyance Act are distinct and different concepts from the contract principle of consideration...."). Thus, Vision argues that, even though the Original Agreement was deemed fully performed as part of the assumed First Agreement, the benefits running to Vision under the Original Agreement might still be less than the reasonably equivalent value of the payments it made to Demag.

The fact that Vision executed the Certificate of Final Acceptance regarding the Original Agreement, however, is not the only salient term of the First Agreement that affects Vision's rights against Demag. The First Agreement also released any claims Vision had against Demag under the Original Agreement. Paragraph 13 of the First Agreement states:

> Both Parties declare that with the exception of the claims and/or obligations listed under the present Claim Settlement Agreement no further claims and/or obligations shall exist between the Buyer and Seller.

(First Agreement at ¶ 13.)

When a debtor assumes an executory contract it assumes both the benefits and burdens of that contract. *See, e.g., Delightful Music, Ltd. v. Taylor (In re Taylor)*, 913 F.2d 102, 106–07 (3d Cir.1990) ("The 'assume or reject' dichotomy means simply that if the trustee wishes to obtain for the estate the future benefits of the executory portion of the contract, the trustee must also assume the burdens of that contract."). Vision "had ample opportunity to determine if Demag was in breach of the [Original] Agreement. It may not now raise issues it waived in the First... Agreement." *Vision Metals, Inc.*, 311 B.R. at 700.

Vision argues that the First Agreement, executed pre-petition, could not release the fraudulent transfer claims under section 548 because they did not come into existence until after Vision filed bankruptcy.

At the time the First Agreement was executed, however, Vision did have the right under Texas law to avoid the transfers it seeks to avoid in the Complaint. Since the Texas statute is virtually identical to the Bankruptcy Code, it is arguable that the release of the Texas claim also released the similar section 548 claim. Additionally, when the First Agreement was assumed by Vision in the bankruptcy case, Vision's right to pursue fraudulent transfer claims under the Bankruptcy Code had arisen and, by assumption of the First Agreement, was waived as well. Therefore, the releases in the First Agreement preclude Vision from now asserting

the fraudulent transfer action under either bankruptcy or Texas law.

■ Vision also alleges, however, that the First Agreement itself was a fraudulent transfer. This is contradicted by Vision's assertions, relied upon by the Court, in the Assumption Motion that the First Agreement was in the best interest of Vision, the estate, and the creditors of the estate. Vision may not now seek to overturn the results of that assumption on the grounds that the First Agreement had little or no relative value to it. *See, e.g., Teledyne Indus., Inc. v. NLRB,* 911 F.2d 1214, 1217–18 (6th Cir.1990) ("Judicial estoppel is an equitable doctrine that preserves the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship, achieving success on one position, then arguing the opposite to suit an exigency of the moment."); *Paul v. Monts,* 906 F.2d 1468, 1473 (10th Cir.1990) ("A litigant is required to be consistent in his conduct. He may not maintain a position regarding a transaction wholly inconsistent with his previous acts in connection with that same transaction."); *Lewis Indus. v. Barham Constr., Inc.,* 878 F.2d 1230, 1231 (9th Cir.1989) (affirming a ruling that estopped the debtor from arguing breach of contract after it failed to raise the issue at the assumption hearing); *Cukierman v. Mechs. Bank of Richmond (In re J.F. Hink & Son),* 815 F.2d 1314, 1318 (9th Cir.1987) ("The notion that a party in bankruptcy can be permitted to thwart a bankruptcy order which has been conceived and fostered through its participation has been vigorously rejected."); *In re One Bancorp Sec. Lit.,* 151 B.R. 1, 3 (D.Me.1993) (refusing to allow a fraudulent transfer action that would set aside an approved settlement); *In re Reilly,* 105 B.R. 59, 63 (Bankr.D.Mont.1989) (finding that failure to raise issues at relief from stay hearing precluded debtors from later arguing that the procedures applicable to adversary proceedings were to be applied).

Therefore, Vision cannot maintain a fraudulent conveyance action. Demag's motion to dismiss Counts III and IV of Vision's Complaint will be granted.

## IV. CONCLUSION

For the reasons stated above, the Court will grant Demag's Motion to Dismiss the remaining Counts of Vision's Complaint.

An appropriate Order is attached.

### ORDER

AND NOW, this **26th** day of **MAY, 2005,** upon consideration of the Motion for Judgment on the Pleadings filed by SMS Demag, Inc. and the response thereto filed by Vision Metals, Inc., it is hereby

**ORDERED** that the Motion will be **GRANTED;** and it is further

**ORDERED** that **JUDGMENT IS ENTERED** in favor of SMS Demag, Inc., on Counts I, II, III and IV of the Complaint.